**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SCOTT GOLDSTEIN,
<u>Plaintiff-Appellant,</u>

v.

THE CHESTNUT RIDGE VOLUNTEER
FIRE COMPANY; RICHARD YAFFEE;

ROSS MCCAUSLAND; HARRY KAKEL;
WILLIAM NEWBERREY, III; MICHAEL
FOX; EUGENE REYNOLDS; NICK
CORONEOS,
<u>Defendants-Appellees.</u>

No. 99-1089

SCOTT GOLDSTEIN,
<u>Plaintiff-Appellee,</u>

v.

THE CHESTNUT RIDGE VOLUNTEER
FIRE COMPANY; RICHARD YAFFEE;

ROSS MCCAUSLAND; HARRY KAKEL;
WILLIAM NEWBERREY, III; MICHAEL
FOX; EUGENE REYNOLDS; NICK
CORONEOS,
<u>Defendants-Appellants.</u>

No. 99-1180

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-96-1483-JFM)

Argued: December 3, 1999

Decided: July 12, 2000

Before WILKINSON, Chief Judge, KING, Circuit Judge,
and BUTZNER, Senior Circuit Judge.

_____

Judgment affirmed by published opinion. Judge King wrote the opinion for the Court, in which Senior Judge Butzner joined. Chief Judge Wilkinson wrote a separate opinion concurring in part and concurring in the judgment.

_____

**COUNSEL**

**ARGUED:** Charles Grant Byrd, Jr., ALSTON & BYRD, Baltimore, Maryland, for Appellant. Jo Anna Schmidt, LAW OFFICE OF HAROLD A. MACLAUGHLIN, Baltimore, Maryland; Roger Norman Powell, POWELL AND SORRELL, Pikesville, Maryland, for Appellees.

_____

**OPINION**

KING, Circuit Judge:

Plaintiff Scott H. Goldstein appeals the district court's entry of summary judgment in favor of the Chestnut Ridge Volunteer Fire Company ("Chestnut Ridge" or "the company") and the individual members of its Executive Committee, the defendants below. Mr. Goldstein alleges that he was suspended and later terminated from Chestnut Ridge based on the substance of his speech, in violation of the First Amendment. Inasmuch as Goldstein premises his cause of action against this entity and these individuals upon the First Amendment, we must first determine whether Chestnut Ridge's decisions to suspend and to terminate him were under color of law for purposes of 42 U.S.C. § 1983. If so, we then must ascertain whether the district court properly concluded that Goldstein cannot establish a violation of the First Amendment.

With respect to the first question, we hold that Chestnut Ridge, a volunteer fire department in Maryland, is a state actor. We do so because Chestnut Ridge is: (1) carrying out functions, exercising powers, and benefitting from protections traditionally and exclusively reserved to the state; (2) receiving substantial state assistance; (3) subject to extensive state regulation; and (4) considered to be a state actor by the state itself. In the totality of the circumstances, Chestnut Ridge is a state actor whose actions must comport with the First Amendment.[1]

However, in considering the second issue, we conclude that Goldstein cannot establish a prima facie violation of the First Amendment. Although his speech incorporated matters of public concern, which is protected speech, and although Chestnut Ridge's interests do not outweigh the public interest in the substance of Goldstein's protected speech, Goldstein cannot establish that his protected speech was a substantial factor in Chestnut Ridge's decisions to take adverse employment actions against him. For that reason, we must affirm the district court's award of summary judgment to the defendants.

I.

Mr. Goldstein was suspended from the company on March 15, 1996, by Richard Yaffee, President of Chestnut Ridge, and on March 21, 1996, his suspension was upheld by a vote of the Executive Committee. Goldstein's suspension followed his admitted failure to abide by an agreement to bring complaints to Yaffee before submitting them directly to the Executive Committee. On August 29, 1996, while on suspension, Goldstein was terminated from the company, based on

_____

[1] U.S. Const. amend. I provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The First Amendment has been "incorporated" into the Fourteenth Amendment and thereby made applicable against the states. Stromberg v. California, 283 U.S. 359, 368 (1931); Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

his submission of allegedly false safety certifications on behalf of other company members. On May 10, 1996, after his suspension but before his termination, Goldstein filed this action in the District of Maryland. The case proceeded through discovery and, following the filing of motions and briefs, the district court granted Goldstein partial summary judgment, holding that Chestnut Ridge is a state actor for purposes of 42 U.S.C. § 1983.**2** See Goldstein v. Chestnut Ridge Volunteer Fire Co., 984 F. Supp. 367, 372 (D. Md. 1997).

The district court, on November 13, 1997, certified the state action issue under 28 U.S.C. § 1292(b), but we declined Chestnut Ridge's petition for an interlocutory appeal. The district court then considered cross-motions for summary judgment on the merits and, on January 7, 1999, held that Goldstein's suspension and dismissal did not offend the First Amendment. Accordingly, the court entered summary judgment in favor of the defendants.

We possess jurisdiction over Goldstein's appeal pursuant to 28 U.S.C. § 1291. Before we may address the merits of Goldstein's First Amendment claim, we first must ascertain whether Chestnut Ridge acted under color of law within the meaning of 42 U.S.C. § 1983.

II.

We review the grant of summary judgment de novo. Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In

_____

**2** On August 21, 1997, the district court entered an initial order relating to the summary judgment motions, which both granted partial summary judgment to Goldstein and certified the issue for interlocutory appeal under 28 U.S.C. § 1292(b). Chestnut Ridge then moved to alter or amend the initial order, in response to which the district court rescinded its order insofar as it certified the case for interlocutory appeal. On November 13, 1997, the district court granted the motion to reconsider only to a limited degree (irrelevant for these purposes), re-entered a summary judgment order, and published its opinion.

4

determining whether a party is entitled to summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Myers, 950 F.2d at 167.

III.

A.

With few exceptions, constitutional guarantees, including those of individual liberty and equal protection, "do not apply to the actions of private entities." Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 619 (1991). While this limitation on the reach of the Constitution is fundamental to our federal system, it is not without boundaries. Indeed, were this limitation boundless, states, government agencies, and government officials could avoid constitutional limits and obligations by simply delegating core governmental functions to private actors. This victory of form over substance is not permitted under the guise of federalism; thus, where "governmental authority . . . dominate[s] an activity to such an extent that its participants must be deemed to act with the authority of the government[, the ostensibly private participants are] subject to constitutional constraints." Id. at 620.

Mirroring this pragmatic scheme, section 1983 of Title 42 provides, in pertinent part, that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. This statute, promulgated as part of the Civil Rights Act of 1871,[3] provides "the party injured" with a cause of

---

[3] Ngiraingas v. Sanchez, 495 U.S. 182, 187 (1990) (" `Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871. The Act was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment.'") (quoting Quern v. Jordan, 440 U.S. 332, 354 (1979) (Brennan, J., concurring in judgment)).

action for violations of constitutional rights by "every person," that is, both private persons and private entities, but liability is imposed only for deprivations carried out under color of law. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156 (1978). "In cases construing section 1983, `under color' of law has been treated consistently as equivalent to the `state action' requirement under the Fourteenth Amendment." Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 215 (4th Cir. 1993) (citing Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982)).

As the Supreme Court recently reaffirmed, two principles guide state action determinations:

> [S]tate action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible" and that "the party charged with the deprivation must be a person who may fairly be said to be a state actor."

American Manufacturers Mut. Ins. Co. v. Sullivan , 526 U.S. 40, 50 (1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).**4** In this case, our analysis of state action turns on whether Chestnut Ridge and the members of its Executive Committee "may fairly be said to be . . . state actor[s]." American Manufacturers, 526 U.S. at 50.

A handful of contexts have been identified in which we can be confident that the conduct of an ostensibly private actor is under color of law for purposes of section 1983. The first exists where, "`in light of all the circumstances,' . . . the Government did more than adopt a passive position toward the underlying private conduct." Skinner v. Railway Labor Executives' Assoc., 489 U.S. 602, 614-15 (1989) (quoting

_____

**4** As noted by the Supreme Court in Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982), the two principles "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." As discussed below, the official character of Chestnut Ridge and its Executive Committee members precipitates such a merger of these principles here.

6

Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971)); see also Andrews v. Federal Home Loan Bank of Atlanta, 998 F.2d 214, 217 (4th Cir. 1993). In that situation, a "private party should be deemed an agent or instrumentality of the Government." Skinner, 489 U.S. at 614; see also Peterson v. City of Greenville, 373 U.S. 244, 248 (1963) (finding state action where restaurant excluded patrons based on their race, in compliance with local ordinance); Adickes v. S.H. Kress & Co., 398 U.S. 144, 171 (1970) (holding that private entity acts under color of law if private action was "because of a state-enforced custom"). Second, if the state delegates its obligations to a private actor, the acts conducted in pursuit of those delegated obligations are under color of law. See West v. Atkins, 487 U.S. 42, 54 (1988) (holding that physician, who treated inmates pursuant to part-time contract, was fulfilling state's Eighth Amendment obligations and therefore acted under color of state law); see also Andrews, 998 F.2d at 217. Third, "[o]ne of the paradigmatic means by which a private party becomes subject to section 1983 is through the government's conferral upon that party of what is, at core, sovereign power." United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 906 (4th Cir. 1995). In other words, a private actor is responsible as a state actor if "the function performed [is] traditionally the exclusive prerogative of the State." Id. (quotation and citation omitted). Fourth, "private use of . . . challenged state procedures with the help of state officials constitutes state action." Lugar, 457 U.S. at 933; see also Andrews, 998 F.2d at 217 ("A private party can be deemed a state actor . .. when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.").

At bottom, the state action determination requires an examination of all the relevant circumstances, in an attempt to evaluate "the degree of the Government's participation in the private party's activities." Skinner, 489 U.S. at 614 ("Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances.") (quotations and citations omitted); Evans v. Newton, 382 U.S. 296, 299-300 (1966) ("Only by sifting facts and weighing circumstances can we determine whether the reach of the Fourteenth Amendment extends to a particular case.") (quoting Burton v. Wilmington Parking Authority , 365 U.S. 715, 722

7

(1961)); see also Hicks v. Southern Maryland Health Systems Agency, 737 F.2d 399, 402 n.3 (4th Cir. 1984) ("[T]here is no specific formula for determining state action.") (quoting Howerton v. Gabica, 708 F.2d 380, 383 (9th Cir. 1983)). In this regard, we have also considered, inter alia, (1) "whether the injury caused is aggravated in a unique way by the incidents of governmental authority," Edmonson, 500 U.S. at 622 (citing Shelley v. Kraemer, 334 U.S. 1 (1948)); (2) the extent and nature of public assistance and public benefits accorded the private entity, Edmonson, 500 U.S. at 621 (citing Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478 (1988)); (3) the extent and nature of governmental regulation over the institution, American Manufacturers, 526 U.S. at 52; Haavistola , 6 F.3d at 215; and (4) how the state itself views the entity, i.e., whether the state itself regards the actor as a state actor. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352-53 (1974); Haavistola , 6 F.3d at 216-17. We must underscore that none of these factors, in isolation, establishes state action. However, in the totality of the circumstances, these factors inform our resolution of state action questions.

In short, "the Court has articulated a number of different factors or tests in different contexts," and the facts "which would convert the private party into a state actor [vary] with the circumstances of the case." Lugar, 457 U.S. at 939.

B.

1.

Turning to this case, it is undisputed that Chestnut Ridge is a non-profit Maryland corporation operating under its own constitution and bylaws; it owns the land and building from which it operates; and it holds title to the engines, hoses, and related equipment employed in its fire suppression and rescue activities. In addition, the company elects its own officers and directors, who are responsible for running the company. These facts notwithstanding, there are numerous circumstances present in this case mandating our conclusion that Chestnut Ridge's personnel decisions are made under color of law.

8

2.

a.

We first consider the argument raised by Goldstein below: that Chestnut Ridge is performing a function -- firefighting -- that is traditionally and exclusively a governmental function. Although the Supreme Court has not specifically addressed whether fire protection constitutes a traditional and exclusive state action per se, the Court's treatment of the issue acknowledges, at the very least, "that fire protection may be an exclusive state function." Haavistola, 6 F.3d at 216 n.1. See Evans, 382 U.S. at 302 ("A park . . . is more like a fire department or police department that traditionally serves the community."); Flagg Bros., 436 U.S. at 163-64 ("[W]e would be remiss if we did not note that there are a number of state and municipal functions not covered by our election cases or governed by the reasoning of Marsh[ v. Alabama, 326 U.S. 501 (1946),] which have been administered with a greater degree of exclusivity by States and municipalities than has the function of so-called `dispute resolution.' Among these are such functions as education, fire and police protection, and tax collection. We express no view as to the extent, if any, to which a city or State might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment.").

In that vein, we have identified and discussed, on several occasions, the unique role of firefighters -- without actually resolving whether firefighting is traditionally and exclusively a governmental function. See Adams v. Bain, 697 F.2d 1213, 1217-18 (4th Cir. 1982) (reversing dismissal as premature because fact-specific determination of whether volunteer fire department was state actor could not be made on face of complaint); Kreiger v. Bethesda-Chevy Chase Rescue Squad, 599 F. Supp. 770, 773-74 (D. Md. 1984) (noting that "firefighting is traditionally an exclusively public function" but holding that rescue squad was not "engaged in the public function of firefighting"), aff'd, 792 F.2d 139 (4th Cir. 1986) (unpublished disposition); Haavistola, 6 F.3d at 218-19, 222 (reversing summary judgment granted "on unsubstantiated judicial notice" that volunteer fire departments in Maryland were not state actors and remanding for "fact-

9

intensive determinations");[5] Goldstein v. Chestnut Ridge Volunteer Fire Co., 1994 WL 233356, at *2 (4th Cir. 1994) (unpublished disposition) (holding that "the question whether fire fighting is traditionally an exclusive governmental function in Maryland could not be properly decided as a matter of law on the record [there present], but require[d] resolution of genuine issues of fact raised by conflicting historical evidence").[6] From these prior cases, we may distill two themes: (1) whether firefighting is a traditionally and exclusively governmental function is still an open question, and (2) the determination of whether volunteer firefighting constitutes state action in Maryland is a fact-specific inquiry. There is no doubt that, as the district court noted, the current state of law on this issue might be characterized as "perplexing."[7] Goldstein, 984 F. Supp. at 369 n.2.

On one hand, it is difficult to conceive of a service associated more closely with the state than the provision of fire protection services; on the other hand, any private citizen may assist in the suppression of a fire without being bound by the First Amendment. However, we need not determine here whether firefighting, in the abstract, is a traditionally exclusively governmental function, because Goldstein has submitted evidence sufficient to establish that firefighting has been exclusively and traditionally the function of the government in Mary-

_____

[5] After remand in Haavistola , a trial was conducted in which a jury returned a verdict finding that the volunteer fire department at issue there was not a state actor. Goldstein, 984 F. Supp. at 368. The plaintiff did not appeal the verdict, and we therefore had no opportunity to review the issue.

[6] This earlier case "was instituted by Ivan Goldstein, the father of [Scott Goldstein,] the plaintiff in the present action. The case was voluntarily dismissed by the plaintiff after remand." Goldstein, 984 F. Supp. at 368 n.1.

[7] While we seek to clarify this point below, we pause to note that the district court was correct to make this determination -- whether Chestnut Ridge is a state actor -- as a matter of law. See Blum v. Yarestsky, 457 U.S. 991, 997 (1982) (describing "whether there is state action" as one of "several issues of law"). Of course, this determination need not always be made on summary judgment, nor do we mandate that factual disputes underlying this decision be resolved by the court. Rather, the ultimate resolution of whether an actor was a state actor or functioning under color of law is a question of law for the court.

land. Among other things, Goldstein's expert -- whose opinion was uncontradicted below -- maintained that "`within a reasonable degree of Maryland historical certainty and probability that fire fighting was traditionally an exclusive public function in Baltimore County, Maryland.'" Goldstein, 984 F. Supp. at 371. This expert supported his opinion with "various historical facts," which the district court summarized as follows:

> First, prior to 1881 organized fire protection in the most populous area of Baltimore County, known as "the Belt," had (with one exception) depended upon the services of Baltimore City units from contiguous areas. Second, in 1881 the Baltimore County Fire Department was established. Third, the Waverly Fire Company, the exception just noted, which had been created in 1878 when the county financed the construction of its building and the purchase of its fire equipment, turned over its property to the county's Fire Commissioner when the County Fire Department was established in 1881. Finally, in the years after its establishment the County Fire Department rapidly grew.

Id. Under these facts, the State of Maryland was the exclusive provider of firefighting services until it effectively delegated that function to state-funded private actors. These uncontradicted facts and expert testimony thus clearly establish the first element of the state action determination: Chestnut Ridge has assumed a function -- firefighting -- that has traditionally been the exclusive function of the state.

b.

Insofar as the Supreme Court has admonished the lower courts to examine the totality of the circumstances, see cases cited supra at 6-7, those circumstances reinforce a finding of state action here. Thus, to the extent that there could be any doubt that Chestnut Ridge is fulfilling functions that have traditionally and exclusively been the province of the state -- and we have none -- such doubts are assuaged by the incidents of sovereignty that have been heaped upon Chestnut Ridge. For example, the members of Chestnut Ridge have the authority:

11

(1) to enter buildings "without liability for trespass" where a fire is in progress or "there is reasonable cause to believe a fire is in progress";

(2) to enter any building near a fire to protect it from fire;

(3) to order any person to leave any building or place in the "vicinity of a fire or other emergency" to protect the person from danger;

(4) to order that caravans of vehicles, crafts or railway cars be detached in the interest of safety; and

(5) to maintain order in the "vicinity of a fire or other emergency" by exerting police powers in the area.

See Md. Code Ann. art. 48, § 181 (1999). In addition, members of Chestnut Ridge may be deputized as "deputy sheriffs" and thereby "exercise the powers of such deputies at fires and on the way to and from fires." See Md. Code Ann. art. 87,§ 49. Further, volunteer fire companies -- including members of Chestnut Ridge-- are immune from civil liability for acts taken in the performance of their duties. Md. Code Ann., Cts. & Jud. Proc. § 5-604 (1999).

c.

Chestnut Ridge thus has been cloaked by the sovereign with immunity and endowed with police powers traditionally reserved exclusively to the state. A private party may not, on one hand, function in the exclusive province of the state, exercise powers reserved to the state, and benefit from protections reserved to the state, while on the other hand, act without regard to the Constitution. We thus are confident that Chestnut Ridge is performing functions and exercising "powers traditionally exclusively reserved to the State." Andrews, 998 F.2d at 218 (quoting Jackson, 419 U.S. at 352).

3.

In addition to the foregoing, there are other circumstances surrounding the operation and function of Chestnut Ridge that reinforce

12

our finding that it is a state actor. For example, Chestnut Ridge receives substantial assistance from, and is regulated extensively by, the State of Maryland. Indeed, the district court thoroughly explained this aspect of the case as follows:

> Career and volunteer fire companies in Baltimore County are dispatched to fire scenes by a central county dispatcher. The factors considered by the dispatcher in determining whom to call are the location and severity of the fire or emergency event. At the fire scene, volunteer fire companies are sometimes in command over career fire companies, while on other occasions career and volunteer fire companies share command at the scene.

> Chestnut Ridge (like all volunteer fire companies in Baltimore County) is a member of the Baltimore County Volunteer Fire Association ("BCVFA"). The BCVFA requires that volunteer firefighters have certain types of certification and/or training before they fight a fire in the county. These are the same types of certification and training that the Baltimore County Fire Department requires of its career firefighters. If a volunteer fire company's members fail to meet those requirements, the volunteer company will be suspended from the BCVFA. If the volunteer fire company is suspended, the Baltimore County Fire Department will take the volunteer fire company off its dispatch system and will not dispatch that volunteer fire company to fight any fires in the county.

* * *

> Article 38A, section 7 of the Maryland Code establishes the Office of the Fire Marshal, whose responsibilities include "the establishment and enforcement of fire safety practices throughout the State, preventive inspection and correction activities, coordination of fire safety programs with volunteer and paid fire companies, and other State agencies and political subdivisions exercising enforcement aspects, and critical analysis and evaluation of Maryland fire loss statistics for determination of problems and solutions."

13

Md. Ann. Code art. 38A, § 7(b) (1997). In addition, the Maryland State Firemen's Association, a state-funded association, conducts annual inspections of all fire and rescue apparatus, equipment, and facilities. Md. Ann. Code art. 38A, § 46B.

State-funded training is required for volunteer fire company members, and is conducted by the Maryland Fire and Rescue Institute at the University of Maryland, a state institution. Md. Code Ann., Educ. § 13-103 (1997) .. . . Chestnut Ridge's ambulance service is required to be licensed under section 13-515 of Maryland's education code. State grants and loans to volunteer fire companies, including Chestnut Ridge, are made through the Emergency Assistance Trust Fund and approved and monitored by State agencies. Md. Ann. Code art. 38A, § 46A.

Volunteer fire departments, including Chestnut Ridge, receive significant portions of their operating revenue from the State of Maryland. For example, Chestnut [Ridge] receives State funding that is appropriated by the State to promote:

(1) The delivery of effective and high quality
fire protection, rescue, and ambulance services to
the citizens of this State;

(2) Increased financial support for fire, rescue,
and ambulance companies by local governments;
and

(3) The continued financial viability of volunteer fire, rescue, and ambulance companies given
the greatly increased costs of apparatus and other
types of equipment.

Md. Ann. Code art. 38A, § 45B. Payments under this statute are made to each county for distribution to fire companies for the purchase of equipment and rehabilitation of facilities.

14

Id. Funds distributed to fire companies under this statute are conditioned upon compliance with a requirement that they be audited and copies of the account be submitted to a State agency. Md. Ann. Code art. 38A, §§ 45C-D. Chestnut Ridge receives operating revenue from the State and Baltimore County governments, and uses these funds for items such as insurance, utilities and fuel.

Under Maryland and Baltimore County law, grants and loans are also provided for volunteer fire companies. See, e.g., Baltimore County Code §§ 15-161 et seq. (1988). Members of volunteer fire companies are covered under State and county benefit plans. See, e.g., Md. Ann. Code art. 38A, §§ 42-42B (disability benefits); Md. Code Ann., Lab. & Empl. § 9-234 (1991 & Supp. 1996) (workers' compensation); Md. Ann. Code art. 48A, § 425 (1994) (group life insurance); Baltimore County Code § 23-147 (pensions). Volunteer firefighters are considered on duty for purposes of the Public Safety Officer's Benefit Act. Md. Ann. Code art. 38A, § 45. Volunteer fire companies and firefighters receive several tax benefits and exemptions, see, e.g., Md. Code Ann., Tax-Prop. § 7-209 (1994), and are exempt from paying State and county fees that other private corporations are required to pay. Md. Code Ann., Corps. & Ass'ns§ 1-203.1 (1993).

Goldstein, 984 F. Supp. at 369-70.

Of course, "receipt of state funds alone is insufficient to transform private actions into state actions," and state regulation unrelated to the alleged constitutional violation, even if extensive, is not sufficient, in itself, to effect this transformation. Haavistola, 6 F.3d at 215 (quoting Alcena v. Raine, 692 F. Supp. 261, 267 (S.D.N.Y. 1988)). Nonetheless, substantial state funding and extensive state regulation -- clearly present in this case -- are factors that weigh in favor of a finding of state action.

4.

Another factor relevant to the state actor determination is how the state itself views the entity. In Jackson, 419 U.S. at 353, for example,

15

the Supreme Court relied upon, <u>inter alia</u>, Pennsylvania's view of the function of an electric company in holding that the provision of electric service did not constitute state action. Similarly, we have recognized that the determination of state action based on the actor's adoption of a "traditionally exclusively government function" "hinges on how a given state itself views the conduct of the function by the private entity." <u>Haavistola</u>, 6 F.3d at 218.

In this area, Maryland authority is clear: the State of Maryland regards Chestnut Ridge as a state actor. Maryland courts, for example, have consistently recognized that "firefighting is a governmental function to which immunity would attach if the appellee were a government agency . . . ." <u>Utica Mut. Ins. Co. v. Gaithersburg-Washington Grove Fire Dept., Inc.</u>, 455 A.2d 987, 991 (Md. Ct. Spec. App. 1983), <u>superseded by statute as stated in Chase v. Mayor and City Council of Baltimore</u>, 730 A.2d 239, 247-48 (1999). This recognition was underscored in <u>Potter v. Bethesda Fire Dept.</u>, 524 A.2d 61, 63 (Md. 1987), in which the Maryland Court of Appeals was called upon to decide whether volunteer fire departments in Maryland were "quasi-public corporation[s]." The Court of Appeals defined a quasi-public corporation by reference to 1 W. Fletcher & C. Swearingen, Cyclopedia of the Law of Private Corporations § 63 (1983 Rev. Vol.): "[T]he nature of the business conducted [by a private corporation] may . . . become so affected with a public interest that the corporation thus becomes quasi-public." And, after examining the rights, duties, and public assistance afforded volunteer fire companies, the Court of Appeals concluded:

> These examples of the supervision, oversight and control on the part of the government clearly indicate the peculiarly public nature of the duties performed by the "private" fire corporations in Montgomery County[, Maryland]. They also show that such corporations are, in fact, governmental in nature.

<u>Potter</u>, 524 A.2d at 68-69. In other words, the State of Maryland itself considers volunteer fire companies, like Chestnut Ridge, to be state actors, and although not dispositive, this fact militates in favor of our finding of state action.

16

5.

One final consideration, often arising in the resolution of state action questions, is whether there must be a nexus between the indicia of state action and the specific acts comprising the alleged constitutional violation. That is, under some of the circumstances set forth above, we have required that the plaintiff establish a connection between the color of law and the alleged violation of the Constitution. In <u>Skinner</u>, for example, a railroad's act of testing a group of employees for the presence of drugs or alcohol was held to be under color of law because there was a direct nexus between the testing and federal regulations authorizing the railroad's testing. <u>Skinner</u>, 489 U.S. at 615-16.

There are, however, different considerations at stake once it has been determined that an actor is carrying out functions traditionally and exclusively reserved to the state. We thus conclude that when it has been established that the State has empowered, or is permitting, a private actor to homestead on territory that has heretofore been the exclusive, traditional province of the State, there need be no specific demonstration of a nexus to the alleged constitutional violation. We previously recognized that requiring such a nexus under these circumstances would represent an untoward leap of logic:"If the [actor] were held to be performing a public function for purposes of state action doctrine, then it would be difficult to conclude that personnel decisions reached during the performance of that public function were not subject to constitutional strictures." <u>Andrews</u>, 998 F.2d at 219 n.1; <u>see also supra</u> note 4.

We believe the logic of <u>Andrews</u> -- that no nexus is required under these circumstances -- is correct. The "public function" test is so "carefully confined" that we need not worry that the absence of a nexus requirement will subject actors to inappropriate liability as a state actor. <u>See Flagg Bros.</u>, 436 U.S. at 163. Indeed "[s]tate action via the private exercise of public functions . . . has been found in only narrow circumstances." <u>Andrews</u>, 998 F.2d at 218. Thus, Chestnut Ridge may be held liable as a state actor without the demonstration of a nexus -- a connection between the indicia of state action and the specific acts comprising the alleged constitutional violation -- that has been required in other contexts.

17

6.

We thus hold today that Chestnut Ridge, a volunteer fire department in the State of Maryland, is a state actor. Our conclusion is consistent with and supported by the holding of the Second Circuit in Janusaitis v. Middlebury Volunteer Fire Dept., 607 F.2d 17, 25 (2d Cir. 1979). There, our sister circuit held, under similar circumstances, that a Connecticut volunteer fire department was a state actor for purposes of section 1983. In that case, the Second Circuit carefully examined all of the circumstances present, including: (1) the "indicia of state involvement"; (2) the functions carried out by the actor; (3) the nature of the relationship between the state and the actor; and (4) the powers and authorities that had been conferred upon the actor by the state. Id. at 20-25. In all the circumstances, and under several then-articulated "test[s]," the court held that the volunteer fire department was a state actor. Id. at 25. In short, the totality-of-the-circumstances approach applied in Janusaitis is correct, and under that approach, Chestnut Ridge is functioning under color of law.

We note that the Fifth Circuit applied a different rationale in reaching a contrary holding in Yeager v. City of McGregor, 980 F.2d 337, 343 (5th Cir. 1993). There, the court conducted a "fact-specific review" of the "history, tradition and local law surrounding volunteer fire departments" in Texas, and it applied the "`exclusive' public function" test in isolation before concluding that the volunteer fire department at issue there was not a state actor. Id. at 340-41. We find the Yeager decision to be distinguishable-- on both its apprehension of the law and in its application of the law to the facts. First, the Yeager court applied the "`exclusive' public function" test without consideration of other indicia of state action. In other words, while each of the tests, applied in isolation, may have been insufficient in Yeager to satisfy the state action test, had the indicia been properly viewed in their totality, the conclusion of that court may have been different. Moreover, Yeager is distinguishable on its facts, inasmuch as: (1) there was no evidence that firefighting had been exclusively the province of the government in Texas; and (2) the authority in Texas did not support the conclusion that Texas regarded firefighting as an exclusively governmental function. We therefore do not find Yeager to be persuasive authority.

18

To the contrary, where, as here, an actor: (1) carries out a function -- firefighting -- that has traditionally and exclusively been the province of a State; (2) is endowed with powers and protection, including police powers and sovereign immunity, traditionally exclusively reserved to the State; (3) is substantially funded by the state; (4) is extensively regulated by the state; and (5) is considered to be a state actor by the state itself, we conclude that the actor is a state actor. A necessary corollary of our first conclusion -- that Chestnut Ridge's personnel decisions are "under color" of law for purposes of section 1983 -- is our holding that those decisions must comport with the First Amendment of the Constitution. We thus turn to the next issue to be considered in this appeal: whether Mr. Goldstein can carry his burden to establish a violation thereof.

IV.

A.

Mr. Goldstein joined Chestnut Ridge as a volunteer firefighter in 1985, and for the next ten years, he sought and was elected to a number of company offices. His rise to power in Chestnut Ridge was curtailed in December 1995, when he lost the election for company Captain. Before Goldstein lost this election, he had been a consistent "letter writer"; that is, he was constantly writing to the leadership of Chestnut Ridge with his concerns, worries, and complaints. Nonetheless, it is Goldstein's post-election correspondence to Chestnut Ridge between December 1995 and March 1996 that forms the factual underpinning of his appeal. Thus, we review that correspondence in some detail.

1.

In his first relevant post-election correspondence, dated December 17, 1995, to the Executive Committee,[8] Mr. Goldstein alleged that the Captain was responsible for three errors that occurred during a rescue. Among other things, Goldstein asserted that: (1) the Captain had

_____

[8] The members of the Executive Committee were Richard Yaffee, Ross McCausland, Harry Kakel, William Newberrey, III, Michael Fox, Eugene Reynolds, and Nick Coroneos.

19

"screamed at people to `stay back [at the station] and clean' rather than appointing crews," with the result that the crew responding to the emergency was "very inexperienced" and lacking in proper technical knowledge; (2) the Captain left several emergency technicians behind at the station, which "compromised patient care and caused an unnecessary personnel shuffle to attend to the patients"; and (3) the Captain showed "favoritism" by failing to suspend someone who, in violation of company operating procedures, "showed to the scene [of the emergency]" rather than "proceeding to the Station," inasmuch as the Captain had suspended Goldstein for the same conduct. J.A. 827-28. This letter concluded with a request for a formal investigation and a demand for a written response to the three complaints.

Three days later, on December 20, 1995, Goldstein sent a memorandum to the Executive Committee identifying the Chestnut Ridge firefighters who had: (1) permitted their cardiopulmonary resuscitation ("CPR") certifications to lapse, and (2) failed to take training required for drivers. Goldstein also maintained that firefighters on the list should not be permitted to "ride the apparatus." J.A. 829.

On the same day, Goldstein sent a second memorandum to the Executive Committee asserting that the Captain had committed several errors on another emergency call. Specifically, Goldstein claimed that the Captain had violated a County operating procedure and a company bylaw by responding to an emergency call with a crew of three, instead of a crew of four, and by failing to notify dispatch "that the engine was responding short crew." J.A. 830. This letter also requested a "full investigation" into the incident. Id.

Mr. Goldstein's next letter came two weeks later, on January 4, 1996, when he wrote to defendant Yaffee, President of the Executive Committee. This letter responded to the Executive Committee's apparent rejection of the allegations made in Goldstein's letter of December 17, 1995. In response to that rejection, Goldstein asserted that: (1) the Executive Committee's investigation of his allegations was inadequate and failed to follow the required procedure for investigations; (2) his allegations of safety violations and favoritism were substantiated; and (3) a full investigation should be conducted. Goldstein concluded this letter by underscoring his concern that the Execu-

20

tive Committee had "swept [the issues] under the table" instead of giving his complaints the attention they deserved. J.A. 835.

One week later, on January 11, 1996, Mr. Goldstein sent another letter to Yaffee listing problems Goldstein asserted he had noticed during a recent blizzard. Among other things, Goldstein observed that: "line officers" had failed to adequately stock medical and other supplies; the equipment had been improperly stored; and the Captain's "aloof" response to Goldstein's complaints, coupled with Goldstein's lack of full access to the Engineer's Room (in contrast to other officers who had been permitted access), evidenced favoritism by the Captain. Mr. Goldstein emphasized that these problems were "a detriment to the good of the Company, the safety of our crews/equipment, and the image of the Company in the community." J.A. 832.

During the next week, on January 18, 1996, Mr. Goldstein sent yet another letter to Yaffee raising myriad issues. First, Goldstein requested an investigation into "Jamie Lloyd and Matt Moritz approaching my goddaughter, Dena Gede, at school regarding Company business." J.A. 836. Second, Goldstein informed Yaffee that he had discussed the conduct of the Captain during "the rescue at Park Heights & Walnut Avenues" with representatives of the "Fire Rescue Academy" and the "Volunteer Fireman's Association," and that both representatives had concurred in Goldstein's charge that errors had occurred. Id. Third, Goldstein highlighted some potential consequences to the company if the issues relating to "gear and safety" were not addressed promptly. Fourth, Goldstein noted his belief that the rules were not being enforced fairly, inasmuch as his brothers (and one other firefighter) had received warnings for conduct that had been ignored when committed by other firefighters. Fifth, he inquired whether there was any truth to rumors that Yaffee was considering kicking Goldstein (and others) out of the company. Finally, Goldstein requested that Yaffee investigate whether training requirements were being met by the company. Mr. Goldstein ended this letter by noting that company camaraderie was being undermined by the actions of the newly elected officers, and he made the following request: "I would appreciate it if you would handle this professionally + not allow other members to read this letter." J.A. 837 (emphasis in original).

21

Following transmission of the January 18, 1996 letter, Mr. Goldstein apparently spoke with Yaffee by phone, and on January 19, 1996, sent another letter to Yaffee confirming agreements made during their phone conversation. Among other things, the January 19 letter confirmed that the following steps would be taken: (1) "The Company [would] consistently enforce[] all members taking and using their turnout gear on all fires, rescues and other appropriate situations"; (2) Yaffee would "issu[e] a letter for Mrrs. [sic] Mortiz and Lloyd regarding discussing Company business with my goddaughter"; (3) Yaffee would discuss with the Captain "uniformly enforcing all Company policies"; and (4) Yaffee would address supply issues with the "Line Officers." J.A. 838. In exchange, Mr. Goldstein agreed that he would "bring any problems to [Mr. Yaffee's] attention for resolution before I resort to any other actions in the future." Id. (emphasis added).

2.

On March 10, 1996, Mr. Goldstein sent a memorandum to Mr. Yaffee regarding "Members riding illegally." J.A. 840. He noted that "the Line Officers of the Company are ignoring established Baltimore County Fire Department and Baltimore County Volunteer Fireman's Association rules regarding mandatory training for riding members." Id. Goldstein also noted that riding members were required to have "a current CPR card; Hazardous Materials Operations; Bloodborne Pathogens; and PAT Tags issued," and he asserted that several riding members were not in compliance. Id. Goldstein requested that the Captain be charged with violating the bylaws and that a written report on compliance with the regulations be produced.

The next day, March 11, 1996, Mr. Goldstein sent a copy of this same letter to the Executive Committee. Mr. Yaffee responded on March 15, 1996, by suspending Mr. Goldstein for failing to abide by his agreement, confirmed in Goldstein's January 19 letter (see supra at 22) to bring further complaints to Yaffee's attention before resorting to other actions, including further referrals to the Executive Committee. The Executive Committee affirmed the ninety-day suspension, and, on Goldstein's motion, the entire company was presented an opportunity to review and approve the suspension. On a vote of the company, Mr. Goldstein's suspension was upheld.

22

3.

While on suspension, Mr. Goldstein was terminated in response to certain actions relating to his instruction of CPR classes. Mr. Goldstein allegedly falsified a number of CPR records that he submitted to Chestnut Ridge. Mr. Yaffee was the first to detect the records discrepancy. After hearing the evidence, the Executive Committee voted, on August 29, 1996, to terminate Goldstein.

B.

Based on the uncontested facts set forth above, Goldstein claims that his suspension and subsequent termination abridged his First Amendment rights. The basic First Amendment principles controlling the issue here have long been established. "[A] state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Meyers, 461 U.S. 138, 142 (1983). "Our task . . . is to seek `a balance between the interest of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)). Just as an employee has a right to speak -- even at work -- public employers have the right to run efficient, functional operations, and we must ensure the proper balance between these competing interests.

In that vein, a public employee must establish several elements to state a claim for deprivation of First Amendment rights flowing from an adverse employment action. "First, to trigger First Amendment protection, the speech at issue must relate to matters of public interest." Hanton v. Gilbert, 36 F.3d 4, 6 (4th Cir. 1994) (citing Connick, 461 U.S. at 146). Second, the "employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace." Hanton, 36 F.3d at 6-7 (citing Pickering, 391 U.S. at 568). Third, the employee must establish retaliation of some kind -- that he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights. See Edwards v. City of Goldsboro, 178 F.3d 231, 246 (4th Cir. 1999) ("[A] public

23

employer is prohibited from threatening to discharge a public employee in an effort to chill that employee's rights under the First Amendment."); Huang v. Board of Governors, 902 F.2d 1134, 1140 (4th Cir. 1990) ("[C]laimant must show that the alleged retaliatory action deprived him of some valuable benefit."); DiMeglio v. Haines, 45 F.3d 790, 806-07 (4th Cir. 1995). Finally, the employee must establish a causal relationship between the protected expression and the retaliation: that the protected speech was a"substantial factor" in the decision to take the allegedly retaliatory action." Edwards, 178 F.3d at 248; McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998).

"[T]he order of inquiry may vary with the circumstances of the case." Daniels v. Quinn, 801 F.2d 687, 689 (4th Cir. 1986). Insofar as the first three elements are ultimately questions of law that were resolved by the district court in this case, we examine those questions of law first. The fourth factor -- one of causation -- is one of fact, and as such, it will serve as a basis for summary judgment only in those instances when there are no causal facts in dispute. Therefore, we review the issue of fact last.

1.

The first question of law before us is "whether the speech [involved] a matter of legitimate public concern." Chestnut Ridge has never contested that Mr. Goldstein has fulfilled this element. And, in considering this issue, the district court held:"Because Goldstein crit-icized the actions of public officials and questioned the propriety of actions taken by a governmental entity, his letters involved a matter of public concern. Indeed, his letters addressed a matter of public safety, which is one of the foremost public concerns imaginable." J.A. 1344-45 (citation omitted). Although we agree with the district court that Goldstein's speech involved matters of public concern, applica-tion of the remaining elements mandates a closer examination of the speech at issue.

"Whether an employee's speech addresses a matter of public con-cern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. We must carefully review the entire record to ensure that matters of internal policy, including mere allegations of favoritism,

24

employment rumors, and other complaints of interpersonal discord, are not treated as matters of public policy:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark -- and certainly every criticism directed at a public official -- would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

Id. at 149. In our inquiry, we seek to determine "whether the `public' or the `community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a `private' matter between employer and employee." Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir. 1985). This is a subtle, qualitative inquiry; we use the content, form, and context as guideposts in the exercise of common sense, asking throughout: would a member of the community be truly concerned with the employee's speech?

We begin with the content of Goldstein's speech. Our de novo review of the relevant communications evidences that during the relevant period, the correspondence covered the following subjects:

- Twelve allegations of safety violations: J.A. 827-28 ((1) inexperienced crew and (2) insufficient technical training); J.A. 829 ((3) lapsed CPR certificates and (4) inadequate training); J.A. 830 ((5) short crew); J.A. 833-35 ((6) insufficient investigation of safety violations); J.A. 831-32 ((7) insufficient supplies and (8) improperly stored equipment); J.A. 836-37 ((9) inadequate gear on emergency call; (10) failure to stabilize vehicle during emergency call; and (11) failure to enforce training requirements); J.A. 840-41 ((12) crewmembers riding to emergencies without proper training).

- Three allegations related to favoritism by the Captain: J.A. 827 ((1) Captain suspends Goldstein for conduct then later fails to

25

suspend another crewmember for same conduct); J.A. 831-32 ((2) Goldstein denied access to "Engineers room"); J.A. 836-37 ((3) gear policy enforced against some but not others).

- Other complaints: J.A. 836-37 ((1) Goldstein's goddaughter contacted about company business and (2) rumors that Goldstein (and others) were to be terminated from the company).

Thus, Goldstein's "speech" between December 1995 and March 1996 contained three general substantive categories of communication: (1) safety; (2) favoritism; and (3) miscellaneous expressions of other concerns.

Matters relating to public safety are quintessential matters of "public concern." See Edwards, 178 F.3d at 247 (noting that police officer's speech, relating to proper use and manner of handling concealed weapons, affected public safety and involved matters of public concern); Lee v. Nicholl, 197 F.3d 1291, 1295 (10th Cir. 1999) (holding that employee's memoranda concerning traffic safety at particular intersection was on matter of public concern); Kincade v. City of Blue Springs, 64 F.3d 389, 396 (8th Cir. 1995) ("These statements concerned potential danger to the community's citizens, which surely is a matter of concern to the public and not of some personal interest solely to the speaker."). While the content of Goldstein's speech incorporated matters that were clearly of public concern -- including allegations that safety regulations were being violated, the relevant communications also incorporated matters that are not of public concern, including matters of internal policy, favoritism, and other employment-related matters.

In assessing whether the speech included matters of public concern, we consider next the form of the speech. The speech with safety-related[9] content was encompassed in letters Goldstein sent to the President and Executive Committee of the company. Notably, Goldstein included requests that his allegations of safety violations not be made known throughout the company. See supra at 21. Perhaps more sig-

_____

[9] We have analyzed the "form" and "context" of the speech whose "content" did not involve matters of public concern, and neither the form nor the context converted those matters into public concerns.

26

nificantly, however, some of the complaints of safety violations were delivered by Goldstein to the Executive Committee in violation of his agreement not to complain directly to the Executive Committee without permitting the company President to first address the concerns. These circumstances notwithstanding, we find that the form of the speech does not diminish the public concern encompassed in Goldstein's speech. We underscore that at the summary judgment stage, we are compelled to view these facts in the light most favorable to Goldstein, and in that light, Goldstein's letters might be seen as a vigorous attempt to press company leadership to address matters deeply affecting public safety. Similarly, the fact that Goldstein did not make his views publicly known does not, in any way, undermine the public concern encompassed in his speech. Indeed, as we recently noted, "[p]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly." Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir. 1996). In short, the form of the speech does not detract from the public concerns encompassed in Goldstein's public-safety related speech.

Finally, we review this speech in the context in which it took place. This correspondence was submitted in the wake of Goldstein's election loss for the position of company Captain; indeed, the volume of Goldstein's correspondence attacking the Captain's leadership increased significantly following Goldstein's loss in the election for that very position. One reaction to an election defeat of this kind would be to recommit oneself to the company, seeking to establish a record upon which a future election victory might be found. Another possible reaction to a defeat of this kind is to undermine the victor, thereby attempting to demonstrate for the electorate that an error was made in selecting a less-than-worthy leader. The former reaction seeks to better the company (and may involve matters of public concern), while the latter reaction seeks to second-guess the leadership (which is more likely to involve purely internal matters). Again, however, we are compelled to view this evidence in the light most favorable to Mr. Goldstein. In that light, we simply cannot conclude that he had anything but a good-faith intent to identify safety violations. In short, Mr. Goldstein's allegations relating to public safety, in the form and context in which they were submitted, involved matters of public concern.

27

2.

Having found that matters of public concern were involved in the speech at issue here, we turn to the second question of law: "[W]hether the degree of public interest in the employee's statement was . . . outweighed by the employer's responsibility to manage its internal affairs and provide `effective and efficient' service to the public." Daniels, 801 F.2d at 690.

Here, we begin with Chestnut Ridge's claimed interest. Chestnut Ridge argues that, as a general matter, its interests in managing its internal affairs -- including promoting efficiency and camaraderie -- outweighs the public interest in this speech. The district court agreed:

> Chestnut Ridge has a legitimate interest in maintaining an orderly and safe work environment. The maintenance of such an environment is itself essential to the public safety. Although Goldstein's safety concerns may have been legitimate -- and Yaffee indicated that some of them were -- the manner in which he raised them was so disruptive to Chestnut Ridge's operation that the Executive Committee felt it was necessary to suspend him for 90 days. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Perhaps more than other public entities, a fire company must have a cohesive work environment. The Executive Committee's response was proportionate to the harm that it reasonably perceived and therefore, in my judgment, was constitutionally justified under the circumstances.

J.A. 1346 (citations omitted). In this vein, Chestnut Ridge generally asserts that it had "an over-riding interest in protecting the safety and security of its members" and that Goldstein's complaints disrupted the company and "put the company in turmoil." Br. for Appellee at 24, 26. Further, even if the actual disruptions, which are without specific evidentiary support here, were not sufficient to justify suspension, Chestnut Ridge claims that significant disruption would have resulted from Mr. Goldstein's conduct. Because, Chestnut Ridge contends, courts give "substantial deference" to a government employer's pre-

28

dictions of disruption, and state entities should not be sidetracked with "less important concerns," we should resolve this balancing test in Chestnut Ridge's favor. Br. for Appellee at 24-25. We agree that volunteer fire companies have a strong interest in the promotion of camaraderie and efficiency, and we thus accord Chestnut Ridge substantial weight for these articulated interests.

We next evaluate the weight to be given the public concern for public safety expressed in Goldstein's speech. Among other things, the substance of the public concern included allegations that some emergency personnel lacked required training and certifications; that the leadership of the company was overlooking violations of safety regulations; and that the conduct of crewmembers was jeopardizing the safety of the crew and of the public.[10] These allegations were a matter of the highest public concern, and as such, they were entitled to the highest level of First Amendment protection. See Connick, 461 U.S. at 152 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.").

In weighing these two concerns -- that of Chestnut Ridge and that of the public -- however, we must reject the district court's analysis. If a member of the public has knowledge that safety is being compromised by emergency personnel, that person should not be discouraged from so reporting. Therefore, to justify sanctions, including suspension from the company, based on the substance of these concerns, Chestnut Ridge was required to make an extremely strong showing. We agree that state actors -- like the firefighting company here -- have a strong interest in promoting internal harmony, trust, and camaraderie amongst its members. However, generalized and unsubstantiated allegations of "disruptions," and predictions thereof, must yield to the specific allegations made by Goldstein here, which related specifically to the safety of the public. Indeed, any complaint by one firefighter that another firefighter is violating safety regulations is sure to affect "camaraderie" in the general sense. However, to adopt the district court's approach would permit fire companies-- and similarly situated state actors -- to sanction the complaining firefighter based

_____

[10] The district court found that Chestnut Ridge's own representatives had conceded that some of Goldstein's concerns were legitimate.

29

upon unsupported and generalized predictions of "disruptions" caused by the complaints. In the context of a fire company, such a result would effectively endorse a "red line of silence," whereby fire companies, police officers and other entities carrying out crucial public functions are permitted to quash complaints affecting public safety under the general aegis of "camaraderie" and the avoidance of disruptions. We are unwilling to countenance such a blanket immunity; indeed, as one commentator aptly observed:

> [A] firefighter's ability to exercise her First Amendment rights could prove crucial to the safety and welfare of a community. If a company is not properly trained, is using outdated equipment, or lacks adequate staffing, the community needs to know about it. In the context of public employment, the Supreme Court has recognized a free-speech easement in government workplaces to facilitate speech concerning matters of public concern. Volunteer firefighters subject to summary discharge or other forms of punishment will think twice before speaking out about problems with the local fire company.

Ronald J. Krotoszynski, Jr., Back to the Briarpatch: An Argument in Favor of Constitutional Meta-Analysis in State Action Determinations, 94 Mich. L. Rev. 302, 331-32 (1995). Although today we resolve the balancing test in favor of Goldstein, we emphasize that the inquiry is a particularized one. In other words, we do not hold that a complainant's interest in voicing safety complaints will always outweigh a police or fire department's interest in maintaining morale and efficiency within its ranks. We merely conclude that when the evidence in this case is viewed in the light most favorable to Goldstein, Chestnut Ridge's generalized and unsubstantiated interests, although substantial, fail to outweigh the public's interest in being aware of these safety violations. See Pickering, 391 U.S. at 570 ("[T]o the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct . . . may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it.").

3.

We next consider whether Goldstein was deprived of a valuable government benefit or adversely affected in a manner that, at the very

30

least, would tend to chill his exercise of First Amendment rights. We need not dwell on this element because it is clearly satisfied here. The Supreme Court has recognized that a failure to hire, a denial of promotion, or denial of transfer may constitute the deprivation of a valuable governmental benefit. Rutan v. Republican Party of Illinois, 497 U.S. 62, 73-76 (1990). The clear import of this holding was that "an adverse employment action did not have to be the substantial equivalent of a dismissal to violate a public employee's rights under the First Amendment." DiMeglio, 45 F.3d at 806. It also makes no difference that Goldstein was a volunteer fireman; he has been stripped of the powers, rights, and obligations heaped upon members of Chestnut Ridge. See supra at 10-11. Thus, inasmuch as Goldstein was first suspended and later terminated from Chestnut Ridge, we conclude that this element has been satisfied.

4.

Finally, Goldstein bears the burden of demonstrating that his protected speech was a "substantial factor" in Chestnut Ridge's decision to suspend him. Edwards, 178 F.3d at 248. The entry of summary judgment necessitates that we review this factor de novo. Mr. Goldstein's burden is thus considerably lighter at this stage of the proceedings, inasmuch as we resolve all factual disputes in his favor. See Jones v. Dodson, 727 F.2d 1329, 1337 (4th Cir. 1984) (If the "`evidence raises genuine issues as to the actual reason for an employee's discharge,' the motivational issue must . . . be resolved by the trier of fact.").

Notwithstanding this standard of review, we must affirm the district court's ruling against Mr. Goldstein because he cannot satisfy his burden of demonstrating that protected speech was a substantial factor in his suspension. In this case, Mr. Goldstein has submitted no evidence, even following the completion of extensive discovery, that the substance of his protected speech was a substantial factor behind his suspension. Left with mere conjecture to this effect, the district court properly awarded summary judgment to the defendants.

At the outset, the record submitted in support of the summary judgment motions clearly evidences that Goldstein was suspended, and later terminated, for reasons unrelated to his allegations relating to

31

public safety. The Executive Committee members, each of whom voted in favor of Goldstein's suspension, articulated a basis for the suspension separate and independent from protected speech. For example, Yaffee testified that he suspended Mr. Goldstein solely because Goldstein sent the letter directly to the Executive Committee on March 11, 1996, in violation of the agreement that Goldstein made on January 19, 1996, under which Goldstein agreed to give Yaffee a chance to remedy any problems before Goldstein would report them to the Executive Committee. Similarly, the other members of the Executive Committee -- Ross McAusland,[11] Henry Kakel,[12] William Newberrey,[13] Michael Fox,[14] Eugene Reynolds,[15] and Nick Coroneos[16] -- each articulated reasons separate and distinct from Goldstein's

_____

[11] McAusland claimed that he voted to suspend Goldstein based on a number of concerns, for which no formal charges were ever filed: (1) sexual harassment liability; (2) expressions of company members who felt unsafe working with Goldstein; (3) Goldstein's insubordination in 1994; (4) Goldstein's turning a mistake by the Captain into "a critique and attack on the [C]aptain" (J.A. 888); (5) Goldstein driving another President out of the company; (6) allegations of Goldstein's use of illegal drugs; and (7) allegations that Goldstein had intimidated other members of Chestnut Ridge.

[12] Henry Kakel testified that his perception was that the company was in a state of "turmoil," and he believed that some of the allegations were "nitpick[y]" and untrue. J.A. 932.

[13] In voting in favor of suspension as a member of the investigating committee that recommended Goldstein's suspension, Newberrey had "hop[ed] that in the 90-day period, that[Goldstein] would cool down a little bit and get over the fact that he didn't make[C]aptain." J.A. 1205. Newberrey also believed that Goldstein had "disrespect[ed] subordinates," J.A. 1214, and "was disrespectful to the senior officers." J.A. 1217.

[14] Fox could only remember that he voted to suspend in reliance on the recommendations of the investigating committee. J.A. 958.

[15] Reynolds stated that he had voted to suspend based on (1) "a pattern of behavior that was disruptive to the company" (J.A. 963); and (2) on the fact that "[t]he great bulk of the accusations were directed to the then captain." J.A. 966.

[16] Coroneos voted to suspend based, inter alia, on the "way [Mr. Goldstein] presented detrimental subjects to the good order of the company," and "his pattern of behavior." J.A. 954.

32

protected speech. The theme suggested by each of the voting Executive Committee members was that the substance of Goldstein's protected speech had nothing to do with his suspension.

Inasmuch as explanations legitimizing otherwise prohibited conduct can easily be conjured post hoc, we have reviewed these explanations with a jaundiced eye. Thus, we have reviewed the record to determine whether any reasonable jury could conclude that the articulated reasons for Goldstein's suspension were a pretext for suspension substantially motivated by Goldstein's protected speech; if a reasonable jury could reach this conclusion, then we must remand the case for trial. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248 (1986) (holding that summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party"). We emphasize, however, that the Executive Committee members need not have been correct in their apprehension of the facts underlying the articulated justifications. On the other hand, those beliefs must have been held honestly and in good faith, and, at this stage of the proceedings, we must be able to discern that the articulated, non-protected-speech-related justifications for the adverse employment actions are not a pretext for retaliation substantially caused by protected speech.

In this case, however, the articulated -- and constitutionally justified -- reasons for the Executive Committee members' individual decisions to suspend Goldstein are substantiated by the balance of the record on appeal. For example, it is uncontested that Goldstein's letter of March 11, 1996, violated his agreement with Yaffee to bring all further complaints to Yaffee before presenting them to the Executive Committee. The violation of a prior employment agreement in this manner furnished a clear justification for sanctions, and any such sanction would have been unrelated to Goldstein's public safety related complaints. Further, Goldstein's violation of his agreement with Yaffee was the articulated reason behind the decision of several Executive Committee members to vote in favor of Goldstein's suspension. Thus, to the extent that the violation of his agreement with Yaffee served as the basis of Goldstein's suspension, his suspension would not have been substantially caused by his protected speech.

Similarly, the members of the Executive Committee plainly perceived that Goldstein's complaints sought to undermine the newly

33

elected Captain's leadership instead of raising safety concerns in good faith. On the record before us, this articulated justification is substantiated. As noted above, Goldstein submitted a high volume of complaints against the newly elected Captain immediately following the election. See supra at 26-27. While this context does not vitiate the public concern encompassed in Goldstein's speech, it does substantiate the claim that "[t]he great bulk of he accusations were directed to the captain," J.A. 966, and that Goldstein's complaints were "nitpick[y]." J.A. 932.

The other facts surrounding Goldstein's suspension also support Chestnut Ridge. Significantly, Goldstein was not sanctioned until he violated his agreement with Yaffee. Further, Goldstein has never alleged that Chestnut Ridge took any action with the intent of quashing the substance of his complaints. To the contrary, Mr. Goldstein concedes that Yaffee reacted to his numerous complaints by requiring only that he (Yaffee) be given the first opportunity to respond to future complaints. Had Goldstein's outlet for complaints been shut off, or had there been no clear procedure for lodging such complaints, then the manner in which Goldstein had submitted his public safety related concerns could not have served as a basis for employment sanctions. However, the facts present here -- including the notice of a clear procedure for the lodging of future complaints -- only serve to reinforce the conclusion that the substance of his complaints was not the cause of the employment sanctions.

That the company actually took steps to remedy the problems Goldstein had identified is another fact that supports Chestnut Ridge. That is, as Goldstein concedes, "[a]fter Goldstein made his allegations, Yaffee and Coroneos issued a memorandum to the Executive Committee setting forth the training and/or certification needed by certain members of Chestnut [Ridge]." Br. for Appellant at 21. Acting to remedy the safety problems identified by Goldstein certainly reinforces the testimony of the Executive Committee members that the substance of the Goldstein's allegations was unrelated to the sanctions later imposed.

In response, Mr. Goldstein argues that two facts require reversal: (1) that the letters sent to Chestnut Ridge between December 1995 and March 1996 were the cause of his suspension in March 1996 and

34

(2) that some of the allegations of safety violations contained in those letters were accurate.**17** Even if true, these allegations do not carry the required burden. What Mr. Goldstein needed to produce was evidence that the protected speech -- the allegations of safety violations -- was a "substantial factor" in his suspension <u>or</u> that the articulated justifications for his suspension were a pretext. He has submitted no evidence to either effect. Instead, his argument is, at base, that because some of his allegations were true, his suspension must have been substantially caused by the allegations. We reject this argument.

In this light, we conclude that no reasonable jury could find that Goldstein's protected speech was a substantial factor in Chestnut Ridge's decision to suspend him. The uncontroverted evidence establishes that Chestnut Ridge suspended Goldstein for other conduct.

5.

In short, having analyzed the "substance, form, and context" of the speech at issue here, we conclude that the communications incorporated both matters of public concern and matters of purely internal concern; that Chestnut Ridge could not have sanctioned Mr. Goldstein for the substance of his protected speech; that he was, in fact, deprived of a benefit; but that as a matter of law, no reasonable jury could conclude that the substance of Mr. Goldstein's protected speech was a substantial factor in the decision to suspend him.**18**

_____

**17** <u>See</u>, <u>e.g.</u>, J.A. 1015-20, 1040-41 (Yaffee admitting some allegations were true); J.A. 1104-09 (Coroneos admitting that members lacked required training).

**18** As for his dismissal, Mr. Goldstein argues that the allegations of falsified records were a pretext, and that Chestnut Ridge actually dismissed him based on his speech. The district court disagreed: "Of course if the evidence upon which an employer discharged an employee was so weak as to give rise to the inference that it was pretextual, there would exist an issue of fact to be decided by the jury. That, however, is not the case here where there is sufficient evidence from which the members of the Executive Committee could properly find that Goldstein had falsified records." J.A. 1347. Having concluded that Goldstein's suspension did not violate the First Amendment, we also affirm the district court's finding that there was substantial evidence upon which Goldstein could have been terminated. We therefore affirm the entry of summary judgment on this count.

35

V.

Having examined the incidents of sovereignty borne by Chestnut Ridge, we conclude that this Maryland volunteer fire department is, as a matter of law, a state actor. For that reason, Chestnut Ridge is bound by the First Amendment. However, because Goldstein cannot establish that protected speech was a substantial factor in his suspension or dismissal, we affirm the district court's entry of summary judgment in favor of the defendants.

AFFIRMED

WILKINSON, Chief Judge, concurring in part and concurring in the judgment:

I am pleased to concur in the majority's opinion except as to Part IV.B.2. The district court correctly found that the fire department's interests in maintaining order and discipline outweighed Goldstein's speech interests under the second step of the Pickering balance. Goldstein went to great lengths to disrupt the department by launching a blizzard of complaints immediately upon losing an election for the department's captaincy. The district court properly recognized that Goldstein's behavior was highly detrimental to Chestnut Ridge's ability to perform its essential function of ensuring public safety. I would therefore not reject the district court's analysis on this point. Rather, I would affirm the judgment without reservation.

Police and fire departments cannot effectively protect public safety without some measure of order and discipline in their ranks. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick v. Myers, 461 U.S. 138, 151-52 (1983). The district court found that Chestnut Ridge's interests in maintaining an orderly and safe working environment outweighed Goldstein's speech interests.

A number of facts support the district court's conclusion on this point. To begin with, the sheer volume and frequency of Goldstein's complaints give them a scattershot quality. Goldstein submitted letters

36

detailing numerous grievances to President Yaffee or the Executive Committee on at least nine occasions over a period of less than three months. Moreover, this barrage of complaints came fast on the heels of Goldstein's loss of the election for the department's captaincy in December 1995. Further, as the majority recognizes, a number of Goldstein's concerns related only marginally or not at all to safety. For example, in his January 4, 1996, letter to Yaffee, Goldstein complained about last-minute changes to meeting times and the potential formation of "cliques" at the station, in addition to raising safety issues. In his January 11, 1996, letter to Yaffee, Goldstein complained about having been denied access to the "Engineers room" during his prior tenure as first lieutenant. Indeed, Goldstein's letters were rife with accusations of favoritism on the part of the newly elected captain. This sort of sniping reinforces the conclusion that Goldstein's speech was directed toward disrupting the company and was motivated in part by personal vendetta.

Contrary to the concerns expressed by the majority, the district court's approach does not permit state actors to immunize themselves from the First Amendment with reflexive appeals to "camaraderie." Rather, the district court undertook a particularized examination of the facts of this case, as Connick/Pickering requires. See, e.g., Connick, 461 U.S. at 142, 150, 154; Pickering v. Board of Educ., 391 U.S. 563, 568, 569 (1968). The district court considered the manner in which Goldstein raised his complaints, as well as testimony concerning the disruptive effect of Goldstein's behavior on the fire department. While acknowledging the great importance of Goldstein's interest in speaking on matters of safety, the district court concluded that, under these particular circumstances, the employer's interests were paramount. Unlike the majority, I would endorse the district court's conclusion on this point.

37