Ava V. HINTON, Plaintiff,

v.

Marcia CONNER, Individually and as City Manager for the City of Durham; Charlene Montford, Individually and as Director of the Department of Housing and Community Development for the City of Durham; and the City of Durham, Defendants.

No. 1:04 CV 0004.

United States District Court, M.D. North Carolina.

March 16, 2005.

See, also, 225 F.R.D. 513.

Stewart W. Fisher, Durham, NC, for Plaintiff.

Erin M. Locklear, Patrick W. Baker, Joel Miller Craig, Durham, NC, for Defendants.

MEMORANDUM OPINION

TILLEY, Chief Judge.

This suit arises from a dispute between Plaintiff Ava Hinton and Defendants regarding Ms. Hinton's termination from her employment with the City of Durham. The case is currently before the Court on Defendants' Motion for Summary Judgment [Doc. # 17]. For the reasons set forth below, the Defendant's Motion will be GRANTED in part and DENIED in part.

I.

The facts in the light most favorable to the Plaintiff are as follows. Ms. Hinton has an undergraduate degree in accounting and a graduate degree in public administration from North Carolina Central University. She was an employee of the City of Durham from 1986 until her employment was terminated in July of 2003. During her sixteen years of employment with the City of Durham she held a variety of administrative and accounting positions. All of her annual performance evaluations were either good or outstanding. In 1995, she became a Housing Project Administrator. In July 1998, she was assigned the task of administering federal programs in the newly formed Department of Housing and Community Development (HCD). Her primary duty was to ensure that the development projects she was assigned by HCD were in compliance with the requirements set forth by the United States Department of Housing and Urban Development (HUD). Essentially, Ms. Hinton was a liaison between HUD and HCD for the development projects that she was assigned.

Defendant Charlene Montford was hired as Director of HCD on September 18, 2000. Ms. Montford previously served as the Director of Community Development in both Jacksonville, North Carolina, and Goldsboro, North Carolina. She quit both jobs under unusual circumstances. In Jacksonville, Ms. Montford developed a relationship with a member of the city council whom she eventually married. The resulting conflict of interest led Ms. Montford to accept the job in Goldsboro. In Goldsboro, one of her direct reports was indicted on five felony counts of demanding kickbacks from contractors, and she left that job shortly thereafter. After leaving Goldsboro, Ms. Montford filed a $750,000 lawsuit against Goldsboro alleging she was harassed for reporting the extortion. The city of Goldsboro settled the case for $21,000 without admitting any liability.

Shortly after accepting the position of Director of HCD in Durham, Ms. Montford developed close personal relationships with two powerful men in local development agencies. She was frequently treated to expensive meals by Ed Stewart, the Chief Executive Officer of United Durham Inc. (UDI), whom she referred to as her "Sugar Daddy." (Hinton Dep. at 195.) UDI received federal money from HCD. Ms. Montford also bragged that she would never be fired "because I have a friend at UDI" and stated, "If you wear a tight skirt and a low cut blouse, you can get anything you want." (App.[1] 16: Fritz Aff. at 4.) Ms. Montford also developed an extremely close relationship with the head of another Durham development agency, Charles Chapman. (App. 15: Williams Aff. at 3; Montford Dep. II at 59–65.) Charles Chapman was in charge of Operation Breakthrough, an agency which received more than $238,000 in federal grant money through HCD.

**1.** Citations to the appendix refer to the appendix to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment [Doc. # 24].

Defendant Marcia Conner was hired in June 2001, as the new City Manager of Durham. She relocated to Durham from Austin, Texas. After taking over as City Manager in Durham, she was accused of violating conflict of interest rules by granting her Texas friends lucrative contracts without bidding them out to the general public. As a result of these accusations in the press, Ms. Conner was stripped of her contracting authority by the City Council. Conner and Montford worked closely together and many city employees viewed them as political allies because Montford often would attempt to take some of the blame for Conner's alleged ethical violations and vice versa.

Even before Montford took the job in Durham, Ms. Hinton had questioned HCD managers about the manner in which the Small Business Loan (SBL) program was being run. The SBL program was intended to encourage economic development by providing low interest loans to businesses in impoverished areas. Each qualified business could receive $35,000 in federal HUD money that was allocated through HCD. The person running the SBL program was Anita Bennett, an independent contractor. Ms. Bennett obtained a no-bid City contract that paid her a salary as well as allowed her to take 11% off the top of each loan. The city employee charged with monitoring the SBL program was Angela Scott, who worked in the Office of Economic and Employment Development (OEED). There was no direct HCD oversight even though funding was through HCD. Ms. Bennett had to present all SBL applications to a loan committee that included Ms. Montford before she could distribute the checks. Ms. Bennett ultimately made loans of public money to friends, relatives, convicted drug dealers, businesses that did not exist, and businesses in upscale areas.

Ms. Hinton has a background in accounting and auditing and was concerned that HCD could not properly account for all the federal funds for which they were responsible. This general concern led to Ms. Hinton's more specific concerns regarding the SBL program. Ms. Hinton questioned the hiring of Ms. Bennett without a competitive bidding process, the lack of adequate supervision of Ms. Bennett, and specific loans that she knew were being made to businesses in high-end areas. Ms. Hinton felt that direct supervision by a project manager in HCD was necessary because HCD was allocating the money. After Ms. Montford was hired as the Director of HCD, Ms. Hinton wasted no time in making her complaints known. On Ms. Montford's second day on the job, Ms. Hinton urged her to assign a program manager to supervise Ms. Bennett and to obtain copies of the SBL files. Ms. Montford disregarded Ms. Hinton's advice.

On October 23, 2000, Ms. Hinton again voiced her concerns about the SBL program during a staff meeting and pointed out that the federal auditor, Jessie Handforth–Komes, was questioning whether the SBL loans were meeting their public purpose. Ms. Montford replied that "Jessie" was "okay" with what Anita Bennett was doing. (Mickle Aff. at 3.) Three days later on October 26, 2000, Ms. Hinton sent a memorandum to Ms. Montford objecting to hiring Ms. Bennet by a no-bid contract and reiterating her other concerns: "That is why I continue to stress the importance of having a project manager oversee the small business loan program. If not me, then have someone else do it. I don't care who it is as long as we are able to do what we need to do and stay in compliance." (Mickle Aff. at 2–3; Ex. 19P.) The memorandum went on to state that despite Ms. Montford's claims that Ms. Bennett told her that HUD auditor Ms. Handforth–Komes was satisfied that the programs

were in compliance, Ms. Handforth–Komes had expressed concerns to Ms. Hinton. Ms. Hinton then "suggested" that HCD have a meeting directly with the HUD auditor instead of trusting Ms. Bennett's comments. Finally, she closed the memorandum by acknowledging that the final decision was Ms. Montford's but that she wanted to ensure Ms. Montford had all the information. Ms. Montford did not heed this advice; instead, she became hostile to Ms. Hinton's perceived meddling in the SBL program.

On June 20–21, 2001, a federal audit revealed potential criminal conduct in the Durham SBL program. On July 17, 2001, the Durham Herald–Sun broke the story under the headline "Police Probe City Business Loans." (App.25.) The very next day, July 18, 2001, Ms. Montford approached Ms. Hinton and told her that "Marcia [Conner] wants any documentation that you have referencing the small business loans. Give me all your e-mails, any notes, or any memorandums that you may have." (Hinton Dep. at 186.) Ms. Hinton complied with the request and produced a stack of documents including her October 26, 2000, memo. Upon reviewing this information Ms. Montford told Ms. Hinton, "You've got some pretty damaging information here." (*Id.* at 187.) The SBL scandal continued to generate public controversy and press coverage for several months. Although newspapers and television stations made more than thirty-eight public record requests for SBL documents, they never received Ms. Hinton's October 26, 2000, memo. During this time Ms. Montford forbade her staff including Ms. Hinton from talking to the press. Ms. Hinton dutifully complied and never took her concerns to the press.

Ms. Conner and the local District Attorney referred the matter to HUD's Inspector General for criminal investigation and the City hired an independent auditor. The final audit report made no mention of Plaintiff's documentation and praised Ms. Montford for being one of the first people to notice problems in the SBL program. The city of Durham eventually negotiated with HUD about the misused funds, and in early 2002, the City agreed to repay more than $600,000 to the federal government.

In addition to Ms. Hinton's objections about the management of the SBL program, in January 2001, Ms. Hinton objected to Ms. Montford's proposed funding of an office for Ms. Bennett that was to be paid for with federal money. Ms. Bennett was a consultant to Ed Stewart of UDI, the man that Ms. Montford called her "Sugar Daddy." In December 2000, Mr. Stewart hosted Ms. Bennett, Ms. Montford, and Durham Mayor Bell to lunch at the University Club. Shortly thereafter, Ms. Montford proposed a plan to use federal money to furnish an office for Ms. Bennett at UDI's incubator facility. However, when Ms. Montford talked to Ms. Hinton about funding this plan with federal money, Ms. Hinton objected on the grounds that it was not an eligible expenditure and would be double-dipping by Ms. Bennett, who was already being paid from federal grants. Again Ms. Montford did not appreciate Ms. Hinton's concerns. Instead, Ms. Montford "got real belligerent" and said, "Well, I've already talked to Jessie [the HUD auditor] about that, and she say that it's fine." (Hinton Dep. at 192.) Ms. Hinton then called the HUD auditor, who denied talking with Ms. Montford and expressed disapproval about the plan unless HCD could show that Ms. Bennett's office would further a national objective. (*Id.* at 193.) When Ms. Hinton confronted Ms. Montford with what the HUD auditor told her, Ms. Montford became "very hostile." (*Id.* at 194.)

Within a month of this discussion, Ms. Hinton was stripped of her job duties as federal programs administrator and given a lesser position with no assignments. Ms. Hinton's job duties were never formally changed; instead, Ms. Montford told her to start reporting to Paul Joyner and to cease working on federal programs. Upon reporting to Mr. Joyner, Ms. Hinton discovered that he had no work for her to do. He eventually assigned her the duties of another project manager who was on maternity leave. One of the projects managed by Ms. Hinton under these new duties was a weatherization program operated by a nonprofit agency called Operation Breakthrough.

Operation Breakthrough used federal money to fund weatherization improvements to low-income neighborhoods. Operation Breakthrough was a nonprofit agency hired by the City to run the federal program. The agency's duties included taking the applications, maintaining the eligibility certifications, contracting for the work, and disbursing the funds. Ms. Hinton was the contact person at the City and she monitored the applications of the properties to be weatherized to ensure compliance. Specifically, Ms. Hinton received summaries of applicant files from Operation Breakthrough that she used to verify that the applicant's income was qualified and that the property was not in a flood plain or a historic site. On January 22, 2002, Ms. Hinton's mother filled out an application with Operation Breakthrough for government funding to weatherize her house.

In June of 2003, Ms. Montford discovered that Operation Breakthrough used $1280.50 in federal grant money to insulate the home of Melzie Peterson, Ms. Hinton's mother.[2] On June 19, 2003, Ms. Montford

confronted Ms. Hinton about the apparent conflict of interest. Ms. Hinton did not hide any facts from Ms. Montford, and she proceeded to explain the entire situation.

Ms. Hinton's brother, Delthy Hinton, suggested the weatherization program to Ms. Peterson without the Plaintiff having any knowledge of it. Ms. Hinton first learned of her mother's application in February of 2002 when she saw the application in the process of monitoring Operation Breakthrough's weatherization program. Ms. Hinton was unaware of specific conflict of interest laws or regulations; however, she was concerned about the potential conflict of interest her mother's application created. She immediately brought the conflict of interest to the attention of her boss, Assistant Director Joyner. She told Mr. Joyner that the application was her mother's and that she had co-signed the loan for her mother on the house that would receive the weatherization work. Ms. Hinton also explained that she did not live in the house and that her mother's will left the property to her brother and sister; Ms. Hinton only cosigned the loan to enable her mother to buy the house. Assistant Director Joyner asked Ms. Hinton to check with Operation Breakthrough, so she spoke to CEO Charles Chapman. Mr. Chapman asked for proof that she did not live in the house with her mother, and Ms. Hinton supplied the deed and utility bills for her own residence. Thereafter, Mr. Joyner and Mr. Chapman agreed that the apparent conflict was resolved and allowed Ms. Peterson's house to receive the weatherization assistance.

After receiving this explanation of the situation, Ms. Montford called Mr. Chapman to investigate the story. Mr. Chap-

---

2. Ms. Peterson is 79 years old and lives on social security. No one disputes that she was eligible under the guidelines to receive the weatherization work.

man confirmed that Ms. Hinton had fully disclosed the conflict to him. Ms. Montford next consulted with Alethea Bell, the City's Human Resources Director. Ms. Bell advised that the appropriate range of disciplinary action under the circumstances could be anything "from a written reprimand upwards." (Bell Dep. at 87.) But Ms. Bell never mentioned terminating Ms. Hinton. Ms. Montford then met with City Manager Conner and they decided to place Ms. Hinton on administrative leave for violating HUD conflict of interest regulations.[3]

Ms. Conner also directed Ms. Montford to talk with a HUD representative about the conflict. The HUD representative told Ms. Montford to review the rest of the Operation Breakthrough files. On June 24, 2003, Ms. Montford along with Mr. Chapman reviewed the files and discovered that two Operation Breakthrough employees also had conflicts of interest. One employee had used $3,902.50 to weatherize his own home, and the other employee had used $331.97 to weatherize his mother's house. Ms. Montford reported the discovery of the additional conflicts to Ms. Conner, but neither of them ever informed Ms. Hinton. Ms. Montford claims that she did inform HUD of these additional conflicts by a telephone conversation.

On July 8, 2003, Ms. Montford asked Ms. Hinton to come to the office where she was issued a memo notifying her that her employment was terminated due to her violation of HUD's conflict of interest regulation. On July 10, 2003, two days after Plaintiff was fired, Ms. Montford wrote a long letter to HUD, condemning Ms. Hinton's conduct. However, she never wrote any letters to HUD regarding the ethical conflicts of the Operation Breakthrough employees.[4]

Ms. Hinton protested her termination using the City's grievance procedures. She argued that the her termination was not appropriate because the punishment did not fit the alleged wrong. She requested reinstatement and transfer to another department. The primary witness against her at the grievance hearing was Ms. Montford, who in her testimony denied talking with Ms. Hinton about the SBL program prior to the press breaking the story. (Tr.[5] at 34–36.) Nonetheless, the hearing officer found in Ms. Hinton's favor and ordered the City to reinstate her and pay back wages. The hearing officer found that Ms. Hinton was a veteran employee with an excellent work history and no previous disciplinary actions and that she did not in this incident act maliciously or attempt to deceive the City of Durham. The hearing officer also noted that Ms. Montford should have conducted a more

3. Allowing Ms. Peterson to receive weatherization funding, even though she was otherwise eligible, was a conflict of interest under 24 C.F.R. § 570.611. The regulation prohibits persons working with a program to obtain a financial benefit "either for themselves or those with whom they have ... immediate family ties." Upon learning of this violation of the HUD regulation, Ms. Hinton made certain that the City of Durham was reimbursed for the funds expended to weatherize her mother's house.

4. The City of Durham, not Operation Breakthrough, is responsible for reporting to HUD

any money that was improperly paid out of the program. Thus, Ms. Montford would be just as responsible for reporting the ethical conflicts of Operation Breakthrough employees as she was for the City's employees. Although Ms. Montford alleges that she did make phone calls regarding the other employees, she only wrote a letter about Ms. Hinton's conflict of interest.

5. Refers to the transcript of the grievance hearing held on September 29, 2003, regarding the termination of Ava Hinton.

thorough investigation and should have given Ms. Hinton a formal opportunity to respond to the charges at the department level.

Ms. Conner then intervened by assigning Assistant City Manager Sharon Laisure to review the hearing officer's findings. Ms. Laisure said that she considered her purpose in reviewing the decision of the hearing officer was to determine whether his disposition of the case was appropriate. Yet, Ms. Laisure did not review the sworn testimony from the hearing or speak with Ms. Hinton; instead, she paged through a dossier compiled by Ms. Montford that included handwritten notes blaming Ms. Hinton for problems with the SBL program. Ms. Laisure concluded that there was no dispute that Ms. Hinton violated HUD regulations and that her disclosure to her supervisor was irrelevant because she still violated the regulations. Based on these findings, Ms. Laisure determined that dismissal was appropriate and drafted a termination letter for Ms. Conner's signature.

Ms. Conner then revised the letter and mailed it. The final termination letter offered Ms. Hinton the opportunity to apply for other positions with the City of Durham. Ms. Conner testified that she terminated Ms. Hinton because she failed to disclose her own conflict of interest and failed to control the conflicts of other Operation Breakthrough employees. (Conner Dep. I at 123–30.) Ms. Hinton was never told that she was being held responsible for the conflicts of other Operation Breakthrough employees at any point. The first time Ms. Hinton learned of the conflicts of interest of the other employees was when her attorney was taking depositions in preparation for this trial.

After losing her job, Ms. Hinton applied for numerous other positions with the City

of Durham but was rejected for all of them, and she remained out of work for more than a year. After the filing of this lawsuit, Ms. Montford resigned and took a position working for an acquaintance of Ms. Conner in West Palm Beach, Florida. Ms. Conner has also resigned under pressure from the press, the public, and the City Council.

On December 3, 2003, Ms. Hinton filed this lawsuit against Ms. Conner, Ms. Montford, and the City of Durham alleging that Defendants violated her rights to free speech, due process, and equal protection under the United States Constitution and the North Carolina Constitution. She also alleged a state law tort claim for wrongful discharge in violation of public policy. On November 4, 2004, Defendants filed the motion for summary judgment that is currently at issue. Defendants argue that Plaintiff has offered insufficient evidence to support any of her claims. The individual defendants, Charlene Montford and Marcia Conner, also allege that the doctrine of qualified immunity shields them from personal liability.

II.

Summary judgment is proper only when there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. In other words, the materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir.2001). An issue is genuine as to such facts if the evidence is sufficient for a reasonable trier of fact to find in favor of

the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In evaluating a motion for summary judgment, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *See* Fed.R.Civ.P. 56(e). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315–16 (4th Cir.1993).

### III.

■ Defendants first move for summary judgment on Ms. Hinton's claim that she was wrongfully discharged in retaliation for the exercise of her right to free speech under the First Amendment. Ms. Hinton claims that her termination in July 2003 violated her First Amendment rights. She believes she was terminated in retaliation for her criticism of the City's handling of the SBL program in September and October of 2000 and her objections to funding Ms. Bennett's office with federal funds in January 2001. The First Amendment prevents the government from conditioning "public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). However, just as an employee has a right to speak at work, public employers have the right to run efficient, functional operations. In deciding the limits of a public employee's right to free speech, courts must balance "the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

To survive summary judgment on her claim for retaliation based on exercising her First Amendment rights, Ms. Hinton must establish four elements. First, the speech at issue must relate to matters of public concern. *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 351 (4th Cir.2000). Second, Ms. Hinton's interest in First Amendment expression must outweigh the City's interest in efficient operation of the workplace. Third, Ms. Hinton must establish that she was deprived of a valuable benefit. Finally, Ms. Hinton must "establish a causal relationship between the protected expression and the retaliation: that the protected speech was a 'substantial factor' in the decision to take the allegedly retaliatory action." *Id.* at 352. The first three elements are ultimately questions of law for the court. The fourth element is a question of fact, and therefore, it will only serve as a basis for summary judgment when there are no facts that could support a finding for the plaintiff.

In their motion for summary judgment, Defendants do not dispute the second and third elements. Instead they argue both that Ms. Hinton's speech was not a matter

of public concern and that even if it was, she failed to establish a causal relationship between her termination and her protected speech.

## A.

■ To survive summary judgment, Ms. Hinton's speech must be capable of being "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Speech need not be aired "publicly" to the media for it to be considered a matter of public concern. *Goldstein*, 218 F.3d at 354. Speech involves a matter of public concern when "it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir.2004). However, "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Goldstein*, 218 F.3d at 353. The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. *Id.* To avoid this improper result, the inquiry must focus on whether "the public or the community is likely to be truly concerned with or interested in the particular expression." *Kirby*, 388 F.3d at 446. Whether Ms. Hinton's speech fairly addresses a matter of public concern must be determined by exercising a common sense inquiry of whether Ms. Hinton's speech would truly concern a member of the community using three guideposts: content, form, and context of the speech. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

■ The content of Ms. Hinton's complaints largely focused on the manner in which the SBL program was being run by the City of Durham. Ms. Hinton thought the program was inadequately supervised and that there were not enough controls on the federal money being spent in the program. She also questioned the hiring of Ms. Bennett to run the program without using a competitive bidding process. Finally, Ms. Hinton stated her concerns about the City's plan to fund an office for Ms. Bennett using federal money. All of these complaints involved potential mismanagement and wastefulness of public funds, which are all matters that would truly concern members of the community. *See Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir.1998) (finding that speech involving "actual or potential wrongdoing or breach of public trust on the part of government employees" to be a matter of public concern). Indeed, Ms. Hinton's concerns were later verified when the newspapers wrote stories about the abuse in the SBL program. Clearly, the content of Ms. Hinton's speech was of interest to the community when the Durham newspaper later wrote numerous stories about these same issues and when the City had to refund more than $600,000 to HUD.

In determining whether Ms. Hinton's speech included matters of public concern, the form of her speech is considered next. Ms. Hinton never went to the press with any of her concerns. Instead, she communicated her concerns both orally and in a written memorandum to the Director of HCD, Ms. Montford. The fact that Ms. Hinton never made her views publicly known does not, in any way, undermine the public concern of her speech. Public employees do not forfeit the protection of the First Amendment merely because they choose to express their views privately rather than publicly. The form of Ms. Hinton's complaints was not unduly disruptive to the working environment. Ms. Hinton's concerns were expressed in a manner that recognized that the final deci-

sion would ultimately lie with Ms. Montford. Therefore, Ms. Hinton merely sought to bring to the attention of her superiors potential problems in other programs, and the form of her speech does not detract from the public concerns encompassed in her speech.

Finally, Ms. Hinton's speech must be reviewed in the context in which it took place. Ms. Hinton has a background in accounting and auditing and was concerned that HCD was not properly accounting for all the federal funds for which it was responsible. This general concern led to Ms. Hinton's more specific concerns regarding the SBL program. Ms. Hinton first voiced her concerns regarding the SBL program before Ms. Montford ever began working for the City. Ms. Hinton first voiced her concerns to Ms. Montford within two days of Ms. Montford taking over as Director of HCD. She later wrote a memorandum to Ms. Montford because she perceived that the problems with SBL were ongoing and had not been fixed. Further, Ms. Hinton was not seeking any personal advancement by complaining about the management of the SBL program. In her memorandum she explained that someone needed to supervise the SBL program, regardless of whether that person was her or someone else. There is no evidence from the context of Ms. Hinton's complaints that she had anything but a good faith intent to identify mismanagement and abuse of a publicly funded program.

Therefore, the content, form, and context of Ms. Hinton's speech regarding her concerns about the mismanagement and waste of public funds all support finding that her speech involved a matter of public concern.

### B.

Defendants further allege that Ms. Hinton fails to prove a causal relationship between her protected speech and her termination. Because this issue is a factual one, it can be "decided on summary judgment only in those instances when there are no causal facts in dispute." *Love–Lane v. Martin,* 355 F.3d 766, 776 (4th Cir.2004). The causal inquiry involves two steps. "In the first step, the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in inducing the adverse action." *Peters v. Jenney,* 327 F.3d 307, 323 (4th Cir.2003) (quoting *Hall v. Marion Sch. Dist. No. 2,* 31 F.3d 183, 193 (4th Cir.1994)). She does not have to show that her protected speech was the sole motivation for her discharge. "If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have [fired the employee] even in the absence of the protected speech." *Id.*

### 1.

■ Defendants argue that the lengthy time period between Ms. Hinton's protected speech and her termination precludes a finding ˙of causation. However, Defendants overstate the law. The lengthy time period does preclude using temporal proximity to create an inference of retaliation by the Defendants. However, Ms. Hinton is free to present additional evidence other than temporal proximity which supports her claim that her protected speech was a substantial factor in her termination. Furthermore, courts have recognized that causation may be established using temporal proximity when an employee's termination was "the end result of an ongoing pattern of retaliatory behavior." *See Warren v. Prejean,* 301 F.3d 893, 900 (8th Cir.2002) (finding that ongoing conduct was sufficient to prove retaliation when the employee's termination was over four years after

her protected speech). Therefore, the fact that Ms. Hinton was not terminated until two years after her first protected speech is not enough to grant Defendants summary judgment on the issue of causation.

█ Ms. Hinton submits evidence that she was subjected to an ongoing pattern of retaliatory behavior after she exercised her First Amendment rights. She first questioned the mismanagement of federal funds in September 2000, but she continued to raise the issue in meetings with Ms. Montford in October 2000. On October 26, 2000, she followed up her oral complaints with a written memorandum. The Interim Director of HCD, who was in charge before Ms. Montford was hired as the permanent director of HCD, participated in some of these meetings where Ms. Hinton raised her concerns. He noted that Ms. Montford was always irritated with Ms. Hinton's concerns about the SBL program and stated that Ms. Montford viewed Ms. Hinton as an "impediment to the way she wanted to run the federal programs." (Mickle Aff. at 3.)

In January 2001, Ms. Hinton objected to Ms. Montford's plan to furnish an office for Ms. Bennett by using federal money to fund the office space that would be located in the business of Ms. Montford's close friend, Mr. Stewart. Ms. Hinton felt that the money to be spent failed to meet any federal benefits and that it would constitute double-dipping. Eventually, the plan to fund the office was dropped. However, within a month of this episode, Ms. Montford stripped Ms. Hinton of her responsibility for federal programs and gave her a "no work" assignment. This action was the first in a series of retaliatory actions taken against Ms. Hinton.

Six months later, the Small Business Loan scandal was publicized in the media. Only after the media had exposed the SBL scandal did Ms. Montford ask Ms. Hinton for all the information she had on the program. At this point, Ms. Montford realized how much damaging information Ms. Hinton possessed. Over the next two years while the SBL scandal continued to cause problems in the City of Durham, Ms. Montford attempted to drive Ms. Hinton from the workplace.

Although Defendants allege that Ms. Hinton has no evidence other than her own conclusory allegations of Ms. Montford's attempts to drive her from the workplace, Ms. Hinton does have evidence to support her claims. In early 2002, Ms. Montford asked Assistant Director Joyner, Ms. Hinton's direct supervisor, to change his positive performance review of Ms. Hinton before she would approve it. (Joyner Aff. at 3.) He refused to make any changes because in his opinion Ms. Hinton was a good employee, and he was aware that Ms. Montford was looking for bad evaluations as a means of getting rid of Ms. Hinton. (*Id.*) Another employee, Michael Pullum, testified that Ms. Montford liked "yes men" and that she disliked Ms. Hinton because Ms. Hinton "insisted that the City needed to follow all the rules and regulations." (Pullum Aff. at 2.) In April 2003, after Mr. Joyner had retired, Ms. Montford refused to give Ms. Hinton a written performance evaluation; this refusal denied Ms. Hinton a raise in pay for the entire year. (Compl. at 15.)

Ms. Montford understood the legal aspects of employment disputes. She previously had filed a lawsuit arising out of her own termination; she knew the importance of having a rationale to terminate Ms. Hinton. However, not until June 2003, while reviewing weatherization files, did she discover what a reasonable juror could find to have been a pretext to fire Ms. Hinton. Describing the discovery of Ms. Hinton's conflict of interest to her new Assistant Director, Ms. Montford stated,

"Finally, I had a reason to fire Ava Hinton." (Williams Aff. at 5–6.)

A reasonable finder of fact could conclude from this evidence that Ms. Hinton's protected speech was a substantial factor in the decision to terminate her. Ms. Hinton's evidence supporting her claim of retaliation is not based solely on timing: she provides direct and circumstantial evidence that her termination was retaliatory. She also provides evidence that her termination was the end result of an ongoing pattern of retaliatory behavior. Evidence in the record supports Ms. Hinton's contention that Ms. Montford not only treated her unfavorably, but sought a reason to terminate her because of her protected speech.

### 2.

■ Because Ms. Hinton has put forth sufficient evidence that her protected speech was a substantial factor in the City's determination to fire her, the burden shifts to the Defendants to prove that Ms. Hinton would have been fired in the absence of her protected speech. Defendants argue that they fired Ms. Hinton because she violated the HUD conflict of interest regulation. It is undisputed that Ms. Hinton approved an expenditure of federal funds to winterize her mother's home in contravention of a HUD regulation.

But the evidence shows that Ms. Hinton disclosed the conflict to her immediate supervisor, Assistant Director Joyner, and to the CEO of Operation Breakthrough. Both told Ms. Hinton that it was legitimate for her to approve the funding to winterize her mother's home. Ms. Hinton was not trained in federal conflict of interest regulations, and Assistant Director Joyner was responsible for making any necessary disclosures to HUD. The HUD regulations require an agency to make disclosures of conflicts of interest, not the individual.

(Williams Aff. at 8.) By reporting the conflict to her supervisor, the supervisor had the obligation to report the conflict to HUD, not Ms. Hinton. Ms. Montford was aware that Ms. Hinton had disclosed the conflict before any federal money was spent to weatherize her mother's home, yet she still sought to terminate Ms. Hinton.

She went to the Director of Human Resources to ask the appropriate range of discipline who told her that it could be anything "from a written reprimand upwards." (Bell Dep. at 87.) Although a written reprimand was a permissible punishment, Ms. Montford met with City Manager Conner and they decided to terminate Ms. Hinton. After sixteen years of employment with the City of Durham, Ms. Hinton had an excellent work history and no previous disciplinary actions, yet she was terminated over a conflict of interest which she disclosed to her immediate supervisors.

After learning of her termination, Ms. Hinton utilized a grievance proceeding to challenge her termination. After an independent hearing officer heard testimony where Ms. Montford denied that Ms. Hinton had ever stated her concerns about the SBL program, the hearing officer found in Ms. Hinton's favor and ordered the City to reinstate her and pay back wages. Ms. Conner then intervened and had the independent hearing officer's decision reviewed by her Assistant City Manager. After reviewing handwritten notes by Ms. Montford that blamed Ms. Hinton for problems with the SBL program but without ever reviewing the testimony from the grievance hearing, the hearing officer's decision was reversed and Ms. Hinton's termination was reinstated. Ms. Conner then mailed a final termination letter to Ms. Hinton.

Although it is undisputed that Ms. Hinton violated a conflict of interest HUD regulation, a reasonable jury could conclude, when confronted with all of this evidence, that Ms. Hinton's protected speech was ultimately the reason she was terminated, not the conflict of interest. Ms. Hinton's evidence suffices to support, although it surely does not compel, a finding that Ms. Conner and Ms. Montford acted in concert to use Ms. Hinton's violation of a HUD regulation as a pretext for her termination. Defendants do not carry their burden at this stage of litigation of proving that absent Ms. Hinton's protected speech she would have been fired because of her conflict of interest.

Therefore, Defendants' motion for summary judgment on Ms. Hinton's claim of retaliation for exercising her First Amendment rights is DENIED.

### IV.

Defendants next move for summary judgment on Ms. Hinton's claim that she was denied due process under both the United States Constitution and the North Carolina Constitution. The analysis under both constitutions is identical because the "law of the land" clause in the North Carolina Constitution is "considered synonymous with the Fourteenth Amendment to the United States Constitution." *Woods v. City of Wilmington,* 125 N.C.App. 226, 230, 480 S.E.2d 429, 432 (1997).

Determining whether Ms. Hinton's procedural due process rights have been violated requires a two step analysis: Ms. Hinton must first show that she has a protected property interest and only then will there be a consideration of her contention that the process she received was inadequate. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Defendants argue that Ms. Hinton fails to prove the first step: the existence of a property right in her continued employment with the City of Durham. If Ms. Hinton did not have a protected property interest in her continued employment, then analyzing the adequacy of the process she received is unnecessary. Although it protects property interests, the Constitution does not create such interests. The existence of a property right to continued employment is an issue of state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

In North Carolina, a legal presumption exists that all employees are at-will and have no continued entitlement to employment. *Still v. Lance,* 279 N.C. 254, 259, 182 S.E.2d 403, 406 (1971). An employee whose employment would otherwise be at-will may gain a property interest in continued employment where such a right is granted by ordinance or implied contract. *Wuchte v. McNeil,* 130 N.C.App. 738, 741, 505 S.E.2d 142, 144 (1998). Employee handbooks may form the basis of a property right if they are included in the employee's employment contract, or in the case of local governments, enacted as ordinances. *Id.* However, "unilaterally promulgated employee manuals or personnel memoranda do not create a property interest in continued employment." *Id.; see also Walker v. Westinghouse Electric Corp.,* 77 N.C.App. 253, 259, 335 S.E.2d 79, 83–84 (1985) (noting the "strong equitable and social policy reasons militating against allowing employers to promulgate for their employees potentially misleading personnel manuals while reserving the right to deviate from them at their own caprice," but, nonetheless, stating that employers are free to disregard such provisions under North Carolina law). Therefore, Ms. Hinton must offer sufficient evidence that the City of Durham's employee handbook was made part of the employment contract.

■ The only evidence offered in support of her procedural due process claim is testimony that Ms. Hinton was asked to sign the employee handbook and that she considered it a contract. (Hinton Dep. at 42.) Ms. Hinton was specifically asked whether she signed an employment contract when she began her employment. She responded, "Can't remember what all documents I may have signed then, but-other the [sic] handbook, I believe, that we received later on and had to sign for it." (*Id.*) This testimony shows that the employee handbook was not a part of her original employment contract. At most, the signature requirement formed a unilateral contract that North Carolina courts have specifically rejected as creating a property interest. *See Guarascio v. New Hanover Health Network, Inc.*, 163 N.C.App. 160, 165–66, 592 S.E.2d 612, 614–15 (2004). Furthermore, the City of Durham has not enacted its handbook as a local ordinance. To the contrary, Durham has enacted an ordinance that expressly repudiates the existence of any property rights with regard to job status that might otherwise be inferred from an employee handbook. *See* Durham City Ordinances § 14–17 (2004) (stating that "No property rights with regard to ... job status shall be inferred from policy memoranda [or] employee handbooks ... unless such benefits or guarantees have been specifically and explicitly included in this ordinance").

A thorough search of North Carolina case law revealed nothing to support Ms. Hinton's claim that her signature of the handbook alone was enough to constitute a continued property interest in her employment. Ms. Hinton's brief misstates the holdings of the North Carolina precedents she cites by stating that "[u]nder N.C. law, an employment·handbook may constitute a contractual agreement with an employee if she has been asked to sign it and has relied on it." (Pl.'s Br. at 17.) In *Trought*

*v. Richardson*, 78 N.C.App. 758, 338 S.E.2d 617 (1986), the plaintiff had a property interest because she signed the handbook at the time she was hired. Thus, the handbook was a part of the original employment contract. In *Howell v. Town of Carolina Beach*, 106 N.C.App. 410, 417 S.E.2d 277 (1992), the court expressly rejected the holding that Plaintiff claims that it espouses. The opinion refused to find a property interest in continued employment through a unilateral contract. The opinion ultimately found a property interest but only because the employment manual at issue was also a town ordinance. 106 N.C.App. at 417, 417 S.E.2d at 281. Therefore, because Ms. Hinton fails to allege anything other than a unilateral contract in the employee manual, she does not have a property interest in her continued employment with the City of Durham, and it is not necessary to analyze the adequacy of the process provided to Ms. Hinton.

■ Ms. Hinton's brief also refers to a substantive due process claim based on the "arbitrary and capricious reasons" used by the City to terminate Ms. Hinton. Plaintiff's brief does not offer any explanation for this theory and it appears to offer no different basis for challenging her termination than her First Amendment retaliation claim. When the allegations of a substantive due process claim overlap a free speech claim, the First Amendment, not the more generalized notion of substantive due process is the proper guide for analyzing the claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 248 (4th Cir.1999).

Accordingly, Defendants motion for summary judgment on Ms. Hinton's due process claims will be GRANTED.

## V.

■ Defendants also move for summary judgment on Ms. Hinton's equal pro-

tection claims under both the United States and North Carolina Constitutions. Because the Supreme Court of North Carolina has found that the protections of the guarantee of equal protection provided in the Fourteenth Amendment of the United States Constitution have been expressly incorporated into the North Carolina Constitution, the same analysis may be applied to both. *Richardson v. N.C. Dep't of Corr.,* 345 N.C. 128, 134, 478 S.E.2d 501, 505 (1996).

■■■■■ The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. Generally, the equal protection doctrine is applied in situations involving discrimination on the basis of group classification or interference with the exercise of some fundamental right. *See, e.g., Williams v. Hansen,* 326 F.3d 569, 575–77 (4th Cir.2003). Courts traditionally have used a two tiered scheme of analysis when evaluating equal protection claims. Strict scrutiny applies if a person is treated differently based upon membership in a suspect class or because of the exercise of a fundamental right. *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). This strict scrutiny standard requires that the government demonstrate that the classification it imposed was necessary to promote a compelling governmental interest. *Id.* When a government classification does not burden the exercise of a fundamental right or disadvantage a member of a suspect class, the government need only show a reasonably conceivable state of facts that could provide a rational basis for the classification. *Bd. of Trs. v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). This rational basis review also applies when the government intentionally treats a "class of one" differently than other similarly situated employees without some reasonably conceivable basis. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

■■■■ In this case, Ms. Hinton does not claim that she is a member of a suspect class. However, she does claim to be a member of a class of employees who were terminated because they exercised their fundamental right to criticize the mismanagement of a government agency. Ms. Hinton cites no case law to support this "fundamental right." A claim based on an allegation that Ms. Hinton was treated differently in retaliation for speech is at its core a free speech retaliation claim and it does not implicate an equal protection clause claim. *See Kirby v. City of Elizabeth City,* 388 F.3d 440, 447 (4th Cir.2004). Therefore, Ms. Hinton's equal protection claim is not reviewed under strict scrutiny.

Ms. Hinton next claims that she was in a "class of one" who was treated differently from similarly situated employees. Ms. Hinton claims she was treated differently than similarly situated employees who were restored positions and paid lost wages in accordance with the decision of the hearing officer in a grievance hearing. (Compl. at 23.) Because Ms. Hinton offers no proof of any other employees of the City of Durham who received favorable decisions from a hearing officer, this claim cannot be sustained. Ms. Hinton also claims she was treated differently than similarly situated employees with regard to the discipline imposed against her. (*Id.*) She claims that another City employee misused $15,000 in housing funds and was not terminated. However, she has no evidence to support this claim. Ms. Hinton also claims that another employee was caught stealing City property for his beach house and was not fired, but she again proffers no admissible evidence to support

this claim. Because Ms. Hinton has no admissible evidence of similarly situated employees who were not terminated, her claim of different treatment cannot be sustained. The City of Durham has a rational interest in its employees following conflict of interest regulations and terminating an employee who fails to act in accordance with the regulation conceivably furthers that interest.

Therefore, Defendants' motion for summary judgment on Ms. Hinton's equal protection claims is GRANTED.

## VI.

■ Defendants also move for summary judgment of Ms. Hinton's state law claim that she was wrongfully discharged in violation of public policy. North Carolina law recognizes a narrow exception to the rule that an at-will employee may be fired for any reason: An employee cannot be fired if her termination would contravene public policy. This narrow exception has been grounded in considerations of public policy designed either to prohibit status-based discrimination or to insure the integrity of the judicial process or the enforcement of the law. *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 333–34, 493 S.E.2d 420, 423 (1997).

■ Ms. Hinton's Complaint alleges that her termination was a violation of North Carolina's public policy to encourage providing truthful information about the mismanagement of public funds. Because this claim alleges that Ms. Hinton was retaliated against for her speech, this claim is at its core a First Amendment retaliation claim. Any benefits Ms. Hinton would receive under this North Carolina claim, she would also receive under her First Amendment retaliation claim. North Carolina courts have made clear that this public policy exception is extremely narrow and should not be read expansively,

and no North Carolina court has extended this public policy exception to prevent an employer from retaliating against truthful speech. Because the allegations of this claim are entirely duplicative of her First Amendment claim, North Carolina's very narrow exception to its at-will employment rule does not need to be expanded to reach this situation.

Therefore, Defendants' motion for summary judgment on Ms. Hinton's claim she was wrongfully discharged under North Carolina law is GRANTED.

## VII.

■ The individual defendants, Marcia Conner and Charlene Montford, next move for summary judgment on Ms. Hinton's constitutional claims on the basis of qualified immunity. Government officials performing a discretionary function are immune from liability for civil damages unless (1) the officers' conduct violates a federal statutory or constitutional right; (2) the right was clearly established at the time of the conduct; and (3) an objectively reasonable officer would have understood that the conduct violated that right. *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001).

The first step of this inquiry is fully discussed in Part III, *supra*, where it was found that Ms. Hinton has a First Amendment right to raise internal complaints about the mismanagement of a government agency and the misuse of government funds. Next, Ms. Hinton must show that her First Amendment rights were clearly established when she was terminated in July 2003. This inquiry focuses upon "the right [not] at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Id.* at 400. However, this does not mean that a defendant will be protect-

ed only if the exact act has previously been held unlawful; rather, the unlawfulness must be apparent in light of pre-existing law. *Id.*

In 1998, the Fourth Circuit made clear that speech involving "actual or potential wrongdoing or breach of public trust on the part of government employees" is a matter of public concern. *Robinson v. Balog,* 160 F.3d 183, 188 (4th Cir.1998). Thus, by 2003 it was clearly established that Ms. Hinton's speech regarding the misuse of public funds involved a matter of public concern. However, the Fourth Circuit has on many occasions stated that "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' [under *Pickering* ] that is subtle, difficult to apply, and not yet well-defined." *Love–Lane v. Martin,* 355 F.3d 766, 784 (4th Cir.2004). But it has never been said "that a public employee's right to speak on matters of public concern could never be clearly established." *Id.* Although the *Pickering* balance is notoriously hard to apply, in some cases the community's interest in the speech so clearly outweighs the employer's interest in efficiency that it can be "clearly established." *See id.* (relying on the defendant's admission that the plaintiff's speech did not affect their efficiency). In this case, Ms. Hinton's speech did not disrupt the efficiency of the City of Durham in any way; in fact, Defendants did not even challenge the *Pickering* balance element of Ms. Hinton's free speech claim. Therefore, Ms. Hinton's free speech claim was clearly established in July 2003, when she was terminated.

The final element is whether a reasonable person in Defendants' positions would have known that terminating Ms. Hinton violated her First Amendment rights. A City Manager and her Director must be given leeway in managing the employees of the city government. However, reasonable supervisors in the positions occupied by Ms. Conner and Ms. Montford in 2003 would be aware that their employees have the right to complain about perceived mismanagement and waste of public funds and that they cannot retaliate against an employee who makes these complaints to her supervisors without causing any kind of unnecessary disturbances. Therefore, Ms. Conner and Ms. Montford are not entitled to qualified immunity against Ms. Hinton's First Amendment claim. Of course, the liability of Ms. Conner and Ms. Montford ultimately hinges on Ms. Hinton's ability to convince a jury that her termination was retaliation for the exercise of her protected speech.

Accordingly, the individual defendants' motion for summary judgment on the basis of qualified immunity is DENIED.

### VIII.

For the reasons set forth above, Defendant's Motion for Summary Judgment will be DENIED in part and GRANTED in part.